## Allen *versus* Willard.    Willard *versus* Tatham.

1. Actions for injuries from alleged negligence, not founded upon contract or undertaking for safety as a carrier, must be supported by affirmative proof of the fact of negligence.

2. The natural instinct which leads men in their sober senses to avoid injury and preserve life, is an element of evidence; and so, in questions touching the conduct of men, are motives, feelings and natural instincts.

3. A person natural or artificial is not liable for the acts or negligence of another unless the relation of master and servant, or principal and agent, be established between them.

4. When an injury is done by a person exercising an independent employment, the person employing is not responsible to the person injured.

5. These rules apply to cases where the purpose of the contract is lawful, and where the owner of the property on which it is to be executed can lawfully commit it to others.

March 5th and 6th 1868.    Before STRONG, READ, AGNEW and SHARSWOOD, JJ.    THOMPSON, C. J., at Nisi Prius.

Error to the District Court of *Philadelphia*: No. 117 and 178, to January Term 1868.

These were two writs of error in the same case argued together.

In the court below, an action on the case was brought on the 22d of November 1866, by Julia A. Willard, widow, and the minor children of Charles T. Willard, deceased, against George N. Tatham and others, trading as Tatham & Brothers, and Franklin Allen and Joseph Allen, trading as Franklin Allen & Bro.

The declaration in the 1st count charged, that the defendants had undertaken to put up a building on Fifth street, a public highway; and on the 11th of August 1866, took up part of the highway, and made deep excavations in and near it; that it became their duty to put a fence or guard along the side of the excavation, and to make the highway secure, but that they wrongfully left the excavations uncovered and without a guard, and left the highway in a dangerous condition without warning that it was so; and Willard, the deceased, passing along the highway in the night-time, fell into the excavation, and by the negligence of the defendants was killed.    In the 2d count, they charged that the defendants were possessors of premises situate on a public highway, in which there was an opening into a cellarway on the premises, and that they permitted the opening to be uncovered; and that for want of a covering the deceased, in the night-time, fell into the opening and was killed.

On the trial before Hare, A. J., it was admitted that the Tathams were the owners of the premises, and the Allens were contractors doing work there.

The plaintiffs gave evidence, that the cellar was dug 8 or 10 feet deep, and 3 or 4 feet out from the line of the houses; the excavation extended about 20 feet along Fifth street, until

[Allen v. Willard.]

it came to the place where there was a road for the carts to go into the cellar; there was a fence along the road to keep the carts from going over, but nothing to protect passengers from walking into it in a dark night; the pavement was soft, and a person would be likely to walk nearer the excavation to get a better place; bricks were piled up on the street about 12 feet high. On the morning of the 11th of August about 6 o'clock, the deceased was found dead in the excavation, lying on his belly, his face thrown back, his body lying south-westwardly; he was then cold and stiff, his neck was broken, there was a contusion on the top of his head, but the skull was not broken, and there were some small scratches on the palm of his hands: there was a street lamp at the corner of Fifth and Prune streets, about 80 feet from the excavation. When found, there were on his person two watches, and business and photograph cards; he was a man in good health, of temperate and otherwise correct habits; he resided at the corner of Eighth and Parrish streets, and was expected that evening to be at the house of a friend on Fifth street, a short distance beyond the place of the accident.

The defendants (Tathams) gave in evidence the contract between Allens of the first part and the Tathams of the second part, made July 3d 1866, viz.:—

"The said party of the first part agree to furnish all materials for, and to erect and construct, and fully complete for the said party of the second part, all the masons' and bricklayers' work, and do all the necessary excavation required in the construction of a fire-proof building, to be built on the west side of Fifth street near Prune street, Philadelphia, according to and in all respects conforming to the plans thereof, and to the specifications following this agreement and annexed thereto; to finish and entirely complete the said work, and remove from the premises and its vicinity and elsewhere, all rubbish so arising out of the said building, on or before the 1st day of January 1867," &c.

The party of the second part agreed on their part to pay in the manner set out.

The specifications referred to in the agreement were headed:—

"Specification of materials and workmanship required for the masons' and bricklayers' work, &c., for the fire-proof building to be erected for Messrs. Tatham & Brothers, on Fifth street near Prune street, according to the plans and under the direction and supervision of John Fraser, architect."

It provided for taking down old buildings that were on the lot, and the removal of all the materials not suitable for the new building; for the necessary excavation and the removal of the earth and rubbish; for furnishing stone and putting up the masonry; for furnishing brick and putting up the brick-work. The contractors were to provide all material and machinery for

[Allen *v.* Willard.]

building, to bear all loss from accident during the progress of the building, to remove all rubbish when the work should be finished, and bear all loss from neglect of city ordinances, and to pay for all permits—the care of the building to be with the contractors till delivered to the Tathams.

"10. The contractors are to notify the architect in writing when the trenches for the foundation-walls are prepared for building, and no foundation of any sort or description whatsoever is to be laid until they have been examined and approved of by the architect."

The defendants (Allens) gave evidence by William Hutchinson, that he laid stone by the perch on a contract with Allens; that his work began whilst the excavation was unfinished and going on; that the excavation at the place where the accident had occurred was then finished. Samuel Sloan testified, "I did the excavation for this building under contract with Allen & Brother. I did the whole of it." J. F. Lush, a carpenter, in answer to a question, whether he had anything to do with a barricade which had been put up near the excavation, said: "It was placed there, as far as I know, by Mr. Allen; I did not place it there; but when anything was done that required it to be taken down, I replaced it again; I had occasion to take it down and replace it; I can't state exactly when; it was during the progress of the year I was there."

There was other evidence given by the defendants on the question of negligence, which conflicted with the plaintiffs'.

The 4th point of the defendants (Allens) was:—"That the damages (if any) in this case must be measured by the absolute value of the life lost, and not by the pecuniary loss which the designated representatives shall have sustained thereby, and that the loss must be affirmatively shown by those who claim to recover the absolute value of life."

The judge charged that there was no evidence on which to find a verdict against the Tathams.

He further charged:—"In the present instance, the Messrs. Allen are not answerable for any default or neglect that may have been committed by the sub-contractors whom they employed to dig the cellar and build the foundation-walls; because when there is no power to control, there can be no responsibility; but it will be for you to say, whether in view of the length of time during which the excavation is alleged to have remained in an unguarded condition, they should not have supplied the omission of their sub-contractors, by putting up a barrier of sufficient strength to prevent persons passing along the sidewalk from falling into the cellar. But, while I have said that you cannot find against the Messrs. Tatham, yet it does not follow that the Messrs. Allen are in the same position. In the first place, the Supreme Court

[Allen *v.* Willard.]

have not decided that the contractor, who is engaged to put up a building such as this, is not responsible for what occurs while it is progressing. The position of a contractor, who has charge of a building, is not in all respects the same as that of the owner.

"A contractor who undertakes to build a house ought to exercise a general supervision, and see that all the different parts and operations fit together and form a consistent whole, conducing to the result which it is the object of the contract to insure. And in view of this, it may well be his duty to see that the work done by them, whom he employs as sub-contractors, is so done as not to be a source of injury or danger to the owner, to whom he is unquestionably answerable, or to third persons. And if he is negligent in this respect, a recovery may be had by those who are injured by their default."

The court refused to affirm the 4th point submitted by Allens.

The jury found for Tathams and against the Allens, and assessed the damages at $10,000, which was afterwards, on a rule for a new trial, reduced to $5000.

The plaintiffs and Allens respectively took out writs of error.

The paper-book of Willards, plaintiffs in error, did not contain any assignments of error.

Allens, plaintiffs in error, assigned for error, that the court below erred :—

1. In submitting this case to the jury upon the evidence adduced by the plaintiffs.

2. In instructing the jury that the Supreme Court had *not decided* that the contractor who is engaged to put up a building such as this, is not responsible for what occurs while it is progressing.

3. In saying to the jury, " but it will be for you to say whether, in view of the length of time during which the excavation is alleged to have remained in an unguarded and dangerous condition, they (the Allens) should not have supplied the omission of their sub-contractors by putting up a barrier of sufficient strength to prevent persons passing along the sidewalk from falling into the cellar."

4. In instructing the jury that there could be no recovery against the Messrs. Tatham, but allowing them to pass upon the question of the liability of the Messrs. Allen.

5. In instructing the jury that the Messrs. Allen were liable for injuries to third persons, resulting from the defaults or negligence of their sub-contractors.

6. In refusing to affirm the Allens' 4th point.

*W. L. Dennis*, for Allens, on the 1st assignment, referred to Wilson *v.* Forder, 6 Casey 131; P. and R. Railroad *v.* Hummell, 8

[Allen *v.* Willard.]

Wright 375; Brown *v.* Lynn, 7 Casey 510; Reeves *v.* The Delaware, L. and W. Railroad Co., 6 Id. 454; Railway Co. *v.* Hinds, 3 P. F. Smith 512; Hammock *v.* White, 2 C. B. N. S. 593; Cotton *v.* Wood, 98 Eng. C. L. R. 570; Toomy *v.* Railway Co., 91 Id. 148; Peachey *v.* Rowland, 16 E. L. & Eq. 444; Lehman *v.* Brooklyn, 29 Barb. 236.

On the 2d assignment, Painter *v.* Pittsburg, 10 Wright 213; Hunt *v.* Penna. Railroad, 1 P. F. Smith 475.

On the 4th assignment, Laugher *v.* Pointer, 5 B. & C. 547; Quarman *v.* Burnett, 6 M. & W. 499; Milligan *v.* Wedge, 12 A. & E. 741; Rapson *v.* Cubitt, 9 M. & W. 710; Overton *v.* Freeman, 8 E. L. & E. R. 479; Knight *v.* Fox, 5 Exch. 721; Peachey *v.* Rowland, Painter *v.* Pittsburg, Hunt *v.* Penna. Railroad, *supra;* Barny *v.* The City of St. Louis, 17 Mo. 121; Hilliard *v.* Richardson, 3 Gray 349; Blake *v.* Ferris, 1 Seld. 48; Pack *v.* New York, 4 Id. 222; Blake *v.* Thirst, 2 Hurlst. & Colt. Ex. R. 20.

On the 5th assignment, Penna. Railroad *v.* McCloskey, 11 Harris 530.

*P. P. Morris,* for Tathams, referred to Steel *v.* South East Railway, 16 C. B. 550; Hunt *v.* Penna. Railroad, Peachey *v.* Rowland, Overton *v.* Freeman, Blake *v.* Thirst, Blake *v.* Ferris, *supra;* Ellis *v.* Sheffield, 2 E. & B. 767; Rich *v.* Basterfield, 4 Man., Gr. & Scott 784; Storrs *v.* Utica, 17 N. Y. 108; Chicago *v.* Robbins, 2 Black (U. S.) 426.

*C. Gibbons* (with whom was *J. R. Booth*), for Willards, cited Painter *v.* Pittsburg, Barnes *v.* Ward, Ellis *v.* Sheffield, Rich *v.* Basterfield, Peachey *v.* Rowland, Blake *v.* Thirst, Chicago *v.* Robbins, Storrs *v.* Utica, *supra;* Alston *v.* Grant, 24 E. L. & Eq. 122; Clark *v.* Fry, 8 Ohio 359; Diggett *v.* Schenk, 23 Wend. 446; Penna. Railroad Co. *v.* Zebe, 9 Casey 329; Penna. Railroad Co. *v.* Henderson, 1 P. F. Smith 323; Caldwell *v.* Brown, 3 Id. 457.

The opinion of the court was delivered, March 23d 1868, by

AGNEW, J.—These two writs of error being in the same cause, can be conveniently considered together. The action was brought by the widow and children of Charles T. Willard, under the provisions of the Act of 26th April 1855, against the Tathams, as owners of a lot of ground on the west side of Fifth street, in this city, and against the Allens as contractors for the erection of a building on this lot for the Tathams. The declaration alleges negligence in leaving the excavation made for the cellar so unguarded that Willard lost his life by falling into it. All the assignments of error can be reduced to three principal questions.

1. Whether the plaintiffs have shown any ground for a recovery.

[Allen v. Willard.]

2. Whether the liability falls upon the Tathams or upon the Allens.

3. Whether there was evidence of a sub-contract under the Allens to relieve them from liability.

Was the death of Charles T. Willard caused solely by the negligence of the defendants or some of them? That he fell into the pit excavated for the cellar, thereby breaking his neck, and that the excavation was unguarded at the place where he fell in, on the night of the accident, is without contradiction or doubt. But it is argued that his fall is not accounted for, and that the fact that his death was caused solely by the negligence of the defendants is not established by sufficient evidence. It cannot be denied that actions for injuries arising from alleged negligence, not founded upon a contract or undertaking for safety, as that of a carrier, must be supported by affirmative proof of the fact of negligence. Such is the doctrine of Cotton v. Ward, 98 Eng. C. L. R. 568; Hammock v. White, 103 Id. 588; Lehman v. City of Brooklyn, 29 Barb. 234. But unquestionably this proof may be furnished by the very circumstances themselves. In the last case, which approaches nearest to this in its facts, a child four years of age was found in a public well a half an hour after it had been last seen alive. The proof disclosed nothing of the condition of the well at the time of the accident; whether it was open or closed, or whether its cover was sufficient to secure passengers upon the street. The well cover, which had been fastened with leather hinges to the platform, was found in the well with the child, but it was not shown how the child came there or how it fell in. It was held that the proof of negligence was insufficient, the court remarking that negligence must be made out and established by proof, and not left to be inferred from circumstances. This remark, however, was made upon the circumstances then presented to the mind of the judge, and was qualified in the next sentence by saying that the proof need not be direct and positive by some one who witnessed the occurrence and saw how it happened, but it must be such as shall satisfy reasonable and well-balanced minds that it resulted from the negligence of the defendant. Thus qualified, there can be no objection to the doctrine of that case, and this leads us to gather, from the evidence of the plaintiffs here, the facts that shed light upon the nature of the accident. It was shown that the excavation encroached upon the sidewalk about two and a half feet, the width of the pavement having been about twelve feet. At the place where Willard fell over, a plank extended four or five feet from the curbstone toward the cellar, which a passenger might seek to avoid by turning toward the cellar. The light was partially excluded from the sidewalk in front of the cellar by high piles of brick laid in the street along the curbstone. The sidewalk being soft next

[Allen *v.* Willard.]

to the curb, and declining towards the cellar, it was said to be difficult walking there, and a person passing would be apt to walk on the side next to the cellar where the ground was more solid. The persons who first came there early in the morning and found the deceased lying in the cellar, then cold and stiff, saw no barrier at the place he fell in, and none lying beside, but the one that had been used there was found set aside along the fence wall of the African church, the next building north of this lot. Willard was proved to be a man of sober and industrious habits, who was never sick or known to call in a physician. He had a friend living on Fifth street, just below this lot, with whom he had business relations, whom he visited frequently, and who was expecting to see him at his house about that time. Willard was last seen after tea on the evening before at about seven o'clock. The direction in which he fell evidenced that he was going down Fifth street towards his friend's house. When found he had two watches and papers on his person, and had no marks of violence excepting those on his head and hands, which would probably result from a fall. Now all these facts certainly tend to prove that Willard lost his life by falling accidentally into this open and unprotected pit. Walking down the street at night, coming upon a soft sidewalk, stepping toward the cellar side to avoid the plank and gain a firmer footing; and stepping unconsciously within the verge of the excavation extending within the line of the sidewalk, he fell naturally into the position in which he was found. Being a man of sober and correct habits, and of good health, it is improbable he reeled into the cellar when intoxicated, or while laboring under sudden illness; and, bearing no marks of violence on his person, and valuable property being found upon him, it is not likely he was the victim of violence or robbery. The natural instinct which leads men in their sober senses to avoid injury and preserve life, is an element of evidence. In all questions touching the conduct of men, motives, feeling and natural instincts are allowed to have their weight, and to constitute evidence for the consideration of courts and juries. Adding these to the circumstances of this case, we cannot say that the evidence was insufficient to go to the jury as proof of actual neglect on part of the defendants. We discover nothing from which an inference could be justly drawn of concurring negligence on part of the deceased. It was sufficient to justify a finding that Willard came to his death by an accidental fall into the cellar, and that this was owing to the unguarded condition of the cellar on that night.

The second question is upon the liability of the defendants. This depends on the relation which the Tathams, the owners of the cellar, and the Allens, the contractors for the work, bore to each other. Unless it was that of principal and agent, or master and servant, according to the latest and best considered cases, the

[Allen v. Willard.]

Tathams would not be held liable for the conduct of the Allens in the execution of their contract. The doctrine of Bush v. Steinman, 1 Bos. & Pull. 404, which made a special contract for the repair of a house, a ligament to bind together the owner and contractor in the relation of principal and agent, and to ground upon it a recovery against the owner for the negligence of the servant of a sub-contractor, is no longer regarded as the law in England, and has been rejected in several of our sister states. The question was fully discussed upon all the authorities, and decided in this state in the case of Painter v. Mayor of Pittsburg, 10 Wright 213, and in other states in the three cases specially referred to in the opinion, to wit, Hilliard v. Richardson, 3 Gray 349; Barry v. City of St. Louis, 17 Miss. 121; and Blake v. Harris, 1 Seld. 48. Further examination of it in reference to the facts of this case is rendered unnecessary. The principle extracted from the cases is said to be, that a person, natural or artificial, is not liable for the acts or negligence of another, unless the relation of master and servant, or principal and agent, exist between them; and that when an injury is done by a person exercising an independent employment, the party employing him is not responsible to the person injured. Those principles were adopted in the decision of Hunt v. Penna. Railroad Co., 1 P. F. Smith 475. This doctrine, it must be noticed, has regard to cases where the purpose of the contract is entirely lawful, and where the owner of the property upon which the contract is to be executed, can lawfully commit its performance to others. There are cases where responsibility cannot be thrown off through the employment of another to execute it by contract. Such was Ellis v. Sheffield Gas Co., 75 Eng. C. L. R. 767, where the contractor was employed to dig a trench in a public street, without any authority in the employer himself to break ground. Nor does the principle extend to cases where the employer of the contractor has not relinquished his control over the work to be done, and still continues liable for his duty to others in respect to it: Blake v. Hurst, 2 Hurlstone & Coltman's Rep. 20. This is the ground upon which Stous v. City of Utica, 17 N. Y. Rep. 104, was placed; but whether the principle was correctly applied to the facts of that case, I need not now consider. In the case before us the contract between the Tathams and the Allens was for an entirely lawful purpose. It was to do all the necessary excavation and all the masons' and bricklayers' work required in the construction of a fire-proof building on the property of the Tathams. The Allens were to provide all materials, carriage, labor, machinery, tackle, scaffolding, &c., &c., and every other thing requisite and necessary for the full completion of the building according to the plans and specifications, either expressed or implied. They were to have the care of the building and whatsoever belonged thereto during the process and until

completion.   They were also to see that all materials, matters and things connected with their work were properly cared for.   Thus the Tathams fully devolved upon the Allens the entire management and control of the work and the workmen, and cast upon them all the care required to be exercised in its process.   The proof failed to discover the slightest control exercised by the Tathams.

The caption of the specification of materials and workmanship to be furnished and done, " according to the plan and under the direction and supervision of John Fraser, architect," in no wise conflicts with the positive covenants of the contract, casting the entire charge and control of the work on the Allens.   As was said in Painter *v.* The Mayor of Pittsburg, this only gave the power to direct as to the result of the work, without any control over the manner of performing it; or as said in Hunt *v.* Penna. Railroad, it would embrace the kind of structure, design, materials, combinations, and all matters pertaining to the planning of the buildings to be erected.   But as to the mode of accomplishing the work which the contractor undertook, this was left wholly to him.   It gave the Tathams no control over the men employed by the Allens, or over the Allens themselves.   They could not dismiss them or direct their work.   There was but one superior to the workmen, the Allens themselves.   Under these circumstances the court was fully justified in instructing the jury that the Tathams were not responsible for the negligence causing the death of Willard.

The question remaining is whether there was any sufficient evidence of a sub-letting of the work such as took it out of the control and direction of the Allens, and cast the responsibility wholly upon the sub-contractors.   For if there was sufficient evidence before the jury to exempt the Allens on the ground of a sub-contract, we incline to the opinion that the 3d assignment of error on part of the Allens is well sustained, this portion of the charge being inconsistent with the preceding instruction and that afterwards more fully stated in answer to the defendant's 1st point. The jury were fully instructed that if the sub-contract withdrew the work from the control of the Allens, leaving them no right to direct how it should be done, they were not liable for any default or neglect of the sub-contractors employed to dig the cellar and build the foundations, because when there is no power to control there can be no responsibility.   This gave the Allens an open door of escape if there were evidence of any such sub-contract. The learned judge, however, follows this instruction by saying, but it will be for you to say whether, in view of the length of time during which the excavation is alleged to have remained in an unguarded and dangerous condition, they (the Allens) should not have supplied the omission of their sub-contractors, by putting up

a barrier of sufficient strength to prevent persons passing along the sidewalk from falling into the cellar.  This was to say to the jury, Notwithstanding the Allens are not liable for the negligence of their sub-contractors, yet if the latter are remiss in their duty you may hold the Allens liable to supply the omissions of duty on part of the sub-contractors.  It was to discharge the Allens in one breath and charge them in the next.  But were the Allens prejudiced by this instruction?  They were not, if there was no sufficient evidence of their discharge by a sub-contract.  By the contract between the Tathams and the Allens, the latter had assumed the entire charge and control of the work.  The whole responsibility being cast upon them nothing less than clear and satisfactory proof should enable them to pass it over to others, who might be irresponsible or transient persons.  Public policy requires that those intrusted with duties involving the public welfare as well as private interests, should not evade them.  In a populous city, where the lives of many may be endangered by works of this nature, the responsibility cannot be cast off by shifts and pretexts. Starting with this state of the case, the evidence shows nothing whatever to prove that the sub-contracts committed the control of the work to the sub-contractors, or that it was actually cast upon them by the Allens.  William Hutchinson, the first witness called to prove a sub-contract, said, "I am a stonemason, and was engaged upon this building.  I was laying the foundation, being employed by Mr. Allen."  When asked "What was your relation to the work?" he replied, "I laid the stone by the perch."  "With whom did you make your contract?"  Answer: "With Allen & Brother."  At this time he stated that the excavation of the cellar was yet unfinished and going on.

As to the excavation, Samuel Sloan testified, and this was all he said, "I did the excavating for this building under a contract with Allen & Brothers; I did the whole of it."  Not a word was asked of these witnesses as to the terms of their contracts, or how they were to do the work, whether under the control and direction of the Allens or otherwise.  The fact that each had a contract with the Allens for his particular work did not, in itself, separate the Allens from its supervision and control.  To pay for stone-work by the perch, or to do the whole excavation under a contract, does not necessarily destroy the relation of master and servant.  But the defendants themselves made proof of the continued charge of the Allens over it, and touching the very matter in question, John F. Lush, one of the carpenters, in answer to the question, "Had you anything to do with the barricade?" replied, "It was placed there, so far as I know, by Mr. Allen; I did not place it there, but when anything was done that required it to be taken down, I replaced it there."  On this evidence, and it is all we can discover bearing on the question of the sub-contract, there

[Allen *v.* Willard.]

is nothing that would justify the finding of a jury that the respon-
sibility, so fully fixed upon the Allens by their contract, was
thrown off by them under the terms of a sub-contract sufficient to
relieve them from the charge of the work. The error was, there-
fore, not injurious. Finding no error on the record, the judgment
is affirmed in each writ of error.