Ellen HENNIGAN, Administratrix of the Estate of James C. Hennigan, Dec'd.

v.

ATLANTIC REFINING COMPANY and City of Philadelphia.

Bonnie RIDDICK, Administratrix of the Estate of John Riddick, Dec'd.

v.

ATLANTIC REFINING COMPANY and City of Philadelphia.

Roger A. JOHNSON, Administrator of the Estate of Robert C. Wilson, Dec'd.

v.

ATLANTIC REFINING COMPANY and City of Philadelphia.

Civ. A. Nos. 32433, 33306 and 32928.

United States District Court
E. D. Pennsylvania.

Nov. 9, 1967.

David Cohen, James E. Beasley, Sheldon L. Albert, Beasley, Albert, Hewson & Casey, Philadelphia, Pa., for Ellen Hennigan.

Norman Paul Harvey, Liebert, Harvey, Bechtle, Herting & Short, G. Wayne Renneison, Philadelphia, Pa., for Atlantic Refining Co.

Vincent C. Veldorale, Joseph J. Murphy, Murphy, Veldorale & Weisbord, Philadelphia, Pa., for City of Philadelphia.

Richard W. Hopkins, Thomas Raeburn White, Jr., White & Williams, Philadelphia, Pa., for Driscoll Construction Co.

William L. Meritz, Zarwin, Prince, Baum, Steerman & Somerson, Philadelphia, Pa., for Bonnie Riddick.

John J. Cahill, John J. Cahill, Jr., Cahill, Cahill & Lynch, Philadelphia, Pa., for Roger A. Johnson.

———◇———

HIGGINBOTHAM, District Judge.

I.

## AMENDED OPINION

These cases were consolidated and tried to a jury which returned verdicts in favor of each of the three plaintiffs in their actions against defendant, City of Philadelphia, (hereafter called the "City"), and against each of the three plaintiffs in their actions against defendant, Atlantic Refining Company (hereafter called "Atlantic"). In accordance with findings of the jury as expressed in answers to special interrogatories,[1] judgment was entered in favor of each of the plaintiffs against the City and against the City in its cross claim against Atlantic.

The City now moves for judgment notwithstanding the verdict, or in the alternative, for a new trial. In addition, the City seeks an order crediting it with the amount paid to the plaintiffs as workmen's compensation and the amount paid to the plaintiffs by Atlantic, pursuant to a settlement.

Atlantic has also moved for judgment on its cross claim against the City for the amount paid by it to plaintiffs pursuant to the settlement, plus costs and reasonable attorneys' fees.

Jurisdiction was based on diversity of citizenship, and therefore Pennsylvania law is to be applied.

After careful consideration of the myriad claims of the City—both individually and cumulatively—I find no basis for granting the relief sought by those claims. Since this case could have been settled for considerably less than the amount of the verdicts, counsel for the defendant, City of Philadelphia, in a manner of seeming desperation has now saturated the Court with 76 claims in support of his motions. He has synthesized within his motions matters of utter irrelevance, frivolousness and insignificance. This "shotgun" approach makes it difficult for any Court to discern whether any of the pellets sprayed by defendant may even inferentially have some substance. Nevertheless, in view of the magnitude of the total verdicts— $464,300.00—I am attempting to answer those issues which probably have the most relevance. With respect to the scores of other conglomerate allegations urged by the City's counsel, I have found that these assertions individually and cumulatively are without merit; however, I have refused to discuss each of counsel's conglomerate claims since it would require an unnecessary extension of this present 43 page opinion.

II.

## FACTS

Each of the three decedents was employed by the Driscoll Construction Company (hereafter called "Driscoll" or "contractor") on the work of constructing a sewer for the City. The project was to run under 26th Street between Penrose Avenue and Passyunk Avenue, adjacent to Atlantic's "tank farm". Construction was to be by the tunnel method. At 8:00 A.M., August 22, 1962, the decedents entered the tunnel at shaft 5 to begin their work. Approximately 15 minutes later there was an explosion and fire in the tunnel adjacent to that shaft and all three men were killed. A fourth workman, Mr. Gregory, was also killed in this accident. However, his estate did not file suit in the Federal Court.

The plans and specifications for the sewer project were drawn by the Design Division of the City's Water Department (N.T., 90–103, 1398–1400). It was their decision that it be done in tunnel rather than by open trench method (N.T. 155). Pursuant to this design, the water table ran through the tunnel (N.T. 151). Prior to the time the contract was let, the City knew the soil in the area was coarse

---

1. See Appendix.

and porous (N.T. 151–152;' 1435). The City also had extensive prior knowledge that the ground in the area was likely to be saturated with hydrocarbons (i.e. petroleum products) (N.T., 1456, 2198; City's Answers to Riddick interrogatories 1 and 12, and to Hennigan interrogatory 19), and that they were likely to be encountered at the water table (N.T., 517, 518, 1326–36, 1430, 1441–43, 1456).

The contract specifications required that an inspector from the Construction Division of the Water Department be at the job site at any time work was being done. It was his primary responsibility to see that the plans and specifications were followed (N.T. 461, 1485, 1444). These plans and specifications included a requirement that the contractor com-

ply with the regulations of the Bureau of Mines, Explosives and Quarries of Department of Labor and Industry of the Commonwealth of Pennsylvania (N.T., 2188–2189). Each inspector was provided, by the Water Department with a copy of the "Guide for Inspectors" (Exhibit P–36), and it was gone over in detail with them. It was prepared under the direction of Water Commissioner, Samuel Baxter (N.T., 2188), and was intended as " * * * a bible for their inspections." (N.T. 461). Included among the duties of the inspector set out in the "Guide" are detailed instructions concerning both the manner of work and the safety of the workmen.[2]

Both Commissioner Baxter and Mr. Samuel Wilson, Chief of the Water Department's Construction Division, testi-

---

2. (Page citations are to the pages of the Guide.)

Clause G–6 "The prime duty of an Inspector is to see to it that the work to which he is assigned is carried out in strict compliance with the Plans, the Proposal and all of the City Standard Specifications and Standards. This includes checking all of the materials used. The Inspector should understand the reasons for the various requirements of the Specifications and should consult his immediate superior if in doubt * * *." (p. 8).

Clause G–8 "The Inspector is responsible for any failure on the part of the contractor to conduct the work in accordance with the Plans and Proposals, City Specifications and Standards. It is the duty of the Inspector to immediately call to the attention of the Contractor's representative any failure to comply with the requirements. If the Contractor refuses or fails to correct the work, the Inspector should stop this portion of the work and he should report the trouble promptly to his immediate superior." (p. 9).

Clause G–9 "One of the important duties of every Inspector is to be constantly alert to protect the public and the employees of both the City and the Contractor against accidents * * *. "The Inspector * * * should be particularly careful for the safety of all men in tunnels, * * * " * * * Safety * * * should be in mind every time the Inspector goes the rounds of his job." (p. 11).

Clause G–12 "The Inspector assigned to a construction contract must have in his possession on the job, and be thoroughly familiar with, the City's Standard Contract Requirements, all of the Standard Specifications pertaining to his work, and the Plans and Proposal covering his assignment. On sewer contracts he must also have a copy of the Standard Details for Sewers * * *. In these Standards will be found the answers to many of the problems with which the Inspector will be confronted. They should be studied frequently and thoroughly." (pp. 13–14).

Clause E–36 " * * * When the proposal calls for tunnel construction * * * it is of particular importance that the Inspector be familiar with all of the Special Provisions in the Proposal, as well as the Commonwealth of Pennsylvania's Regulations for Tunnel Construction and Work in Compressed Air, referred to in Clause E–32 of this pamphlet * * * " (pp. 27–28. See also Clause E–32, p. 24.) " * * * The Inspector should see to it that the Contractor uses every reasonable precaution to insure the safety of the workmen * * * " (p. 28.)

In addition to the above, Clause E–36 (p. 27) and Clause S–57 (pp. 47–48), for example, provide for situations where the Inspector believes that that actual work should be done in a manner differing from the strict language of the Plans and Specifications.

fied that the Inspector had a definite responsibility for the safety of the workmen, and that the Inspector could order a job, or a portion thereof, stopped to protect the safety of the employees as well as to insure compliance with other specifications (N.T., 475, 485, 2190, 2194, 2196. See also testimony of Mr. M. J. Driscoll, N.T., 1774–75.)

Prior to the date of the accident, the log book of the Contractor, (Exhibit P–83) showed, inter alia, the following entries:

| | |
|---|---|
| May 17: | "* * * gas very strong." |
| May 18: | "* * * gas very strong." |
| May 22: | "* * * gas bad." |
| May 24: | "* * * hit gas at 15 feet." |
| May 28: | "* * * oil, water and gas very bad." |
| May 29: | "* * * gas very very bad." |
| June 7: | "* * * hit water gas and oil at 30 feet." |
| June 13: | "* * * set up and used 14 inch blower. Gas not too bad with same." |
| June 16: | "* * * Gas and oil in shaft caught fire with one spark from torch * * *." |
| June 27: | "* * * Need three blowers." |
| July 6: | "* * * Gas too bad. Pull everything out of hole and move to Number 6 shaft." |
| July 7: | "Gas about one foot in bottom of tunnel." |
| July 12: | "Using large blower * * * and also gas masks." |
| July 13: | "Shut down number 5 and 6 shafts for a few days to see if there is a solution to the gas problem." |
| August 4: | "Shaft has plenty of gas." |
| August 20: | "* * * fumes strong." |

On June 8, 1962, the City's Inspector on the job sent a "Rush Sample" (N.T., 418) of liquid taken from shaft 7 to the Water Department's Materials Testing Laboratory, requesting that it be tested for poisons and explosive possibilities. (N.T., 353–59, 361, 392, 396). Because of the highly inflammable nature of the substance revealed by the initial tests, an immediate report was made by telephone. (N.T., 367–68). In the formal report, sent to the Construction Division eleven days later, the sample was said to be petroleum products having an "ignition point at room temperature." (N.T. 361–62; 366–69).

Had this report been made known to the Chief of the Construction Division, the entire job would have been stopped to find out if the condition existed elsewhere and if something could be done. (N.T. 475).

Moreover, the reasonable and appropriate practice to be followed in the industry, as stated by the Chief of the Bureau of Mines, Quarries and Explosives of The Commonwealth of Pennsylvania, would have been to vacate the tunnel and shut down the job as soon as the inspector became aware of the presence of explosive vapors in the tunnel. Anything that could have caused a spark should have been removed and the job should not have been reopened until the tunnel had been properly ventilated. (N.T., 855, 859–62.)

Despite all of this warning about the danger of fire and explosion, and despite the daily and continuous presence of the City's Inspector, the Contractor continued to use, in the tunnel:

(1) Steel muck carts on steel tracks; (N.T., 630);

(2) An unsealed, non-explosive type electric sump pump, (N.T., 631–32, 661);

(3) Steel tunnel bolts, (N.T., 631);

(4) Unsealed electric plugs, (N.T., 662);

(5) Taped electric wire with "homemade" splices, (N.T., 659–60, 737);

(6) Non-explosive-proof electrical fittings, (N.T., 839, Exhibit P–77);

(7) Metal wire to hold cable to metal tunnel liner plates, (N.T. 665, 667, 859);

(8) Unguarded electric light bulbs, (N.T. 661–62, 751–52).

### III.

Plaintiffs contended that the City was negligent with respect to *both* their design of the sewer, including the drawing up of plans and specifications, and, separately and in addition, the manner in which the City exercised the control which it retained over the manner and method of the work. Following the appropriate suggestion of the Court of Appeals for this Circuit, as to the advantages of submitting factual interrogatories to the jury, pursuant to Rule 49, F.R.Civ.P., separate instructions and separate interrogatories were given to the jury for the issues concerning design and for the issues concerning control. In this way, if any errors were committed on any one phase, and if there was a separate and independent ground on which liability could be predicated, the Court of Appeals will have the advantage of specific findings, and thus not be forced to order the retrial of the entire case. See Albergo v. Reading Co., 372 F.2d 83, 86 (3rd Cir., 1966); Pritchard v. Liggett & Myers Tobacco Co., 370 F.2d 95 (3rd Cir., 1966); Cate v. Good Brothers, 181 F.2d 146, 148 (3rd Cir., 1950).

These separate findings are of particular importance in this case, since from my view, as from the jury's view, the evidence totally preponderates in establishing the negligence of the City both in the manner in which it designed the project—in placing the tunnel at the water table, in an area in which the soil was permeated with petroleum products, without establishing appropriate and explicit standards for assuring safe working conditions—*and also* in the manner in which it exercised that control which it retained through its contract with Driscoll.

### A. DESIGN OF THE SEWER

With respect to the design of the sewer, the City knew or should have known:

(1) The project site was adjacent to a petroleum tank farm;

(2) There was likely to be petroleum in the soil at such a site;

(3) The porous soil at this project site was conducive to the continuous and rapid flow of water and other liquids;

(4) Petroleum floats on water;

(5) Petroleum products vaporize in air readily;

(6) Petroleum vapors may be ignited readily by sparks from any source, and if mixed with a certain percentage of air, will then explode;

(7) The project went through the water table.

In spite of their knowledge of these factors, which rendered their work in this tunnel particularly susceptible to fire and explosion, the City's Design Department failed to specify particular precautions to be taken to minimize the danger, or in the alternative, to avoid going through the water table at this site. Thus, the jury's finding that the City was negligent with respect to the design of the sewer is clearly supported by the evidence.

### B. CONTROL BY THE CITY

Counsel for the City urges the Court to hold that, as a matter of law, having retained a competent independent contractor, the City is not liable for any injury to the contractor's employees caused

by—it is argued—the negligence of the contractor.

So phrased, the argument misconstrues the theory put forth by the plaintiffs which is that the City did retain control of the manner of operation by the contractor, that in the exercise of that control they were negligent and that that negligence was a proximate cause of the accident in which the decedents were killed. Support for plaintiffs' position is found in the decisions of the Pennsylvania Supreme Court and of the Court of Appeals for the Third Circuit as well as in the Restatement of Torts.[3]

### 1. *Authority*

In Stork v. City of Philadelphia, 199 Pa. 462, 49 A. 236 (1901), a land owner sued the City for damage to property caused when the adjacent ground gave way due to faulty shoring in the construction of a subway for the City by Flynn, an independent contractor.

"* * * It appeared that the city retained the right to determine when an underpinning or shoring up of foundations should be done. The city refused to authorize the shoring up of plaintiff's house, when the excavation was first made, and this resulted in serious damage to the property.

"The undisputed evidence shows that the city not only retained the right to determine when any underpinning or shoring up of foundations should be done * * * but did in fact refuse or neglect to authorize the shoring up of plaintiff's house when the excavation was first made. This omission was the negligence complained of as the cause of the injury. There was evidence, therefore, on which the case must have gone to the jury * * *."

Similarly in Spinozzi, Pennsylvania Threshermen & Farmer's Mut. Cas. Ins. Co., Intervenor v. E. J. Lavino & Co.,

243 F.2d 80 (3rd Cir., 1957), Judge Kalodner pointed out:

"Both parties concede, and it is apparent from the record, that Morello (plaintiff's employer) stood in the position of an independent contractor. Plaintiff urges, however, that Lavino owed a duty of care to the decedent due to the control it retained over the job, and, as a result of its failure to provide shoring, Lavino should be liable for the harm to decedent.

"It is the general rule that the employer of an independent contractor is not responsible for the misconduct of the contractor while the latter is performing under the terms of the contract. Painter v. Mayor, 1863, 46 Pa. 213; Allen v. Willard, 1868, 57 Pa. 374. The rule is justified on the ground that since the employer does not control the work being performed, he should not be liable for the harm resulting from the substandard performance of the independent contractor. Following this line of reasoning, it is apparent that where the employer has retained some element of control of the job, he[4] should be *responsible for the harmful consequences of its performance as a concomitant of the control retained.* The Pennsylvania courts have recognized that the employer should be liable where he has retained control of some part of the work * * * and his failure to exercise that control with reasonable care causes harm to others. Pender v. Raggs, 1896, 178 Pa. 337, 35 A. 1135; Stork v. [City of] Philadelphia, 1901, 199 Pa. 462, 49 A. 236; McGrath v. Pennsylvania Sugar Co., 1925, 282 Pa. 265, 127 A. 780. * * *" (Emphasis added.) 243 F. 2d at 82–83.

Judge Kalodner thus makes it quite explicit that the land owner who employs an independent contractor may

---

3. Restatement 2d, Torts §§ 413–416 (1965).

4. Certainly the "employer" referred to by Judge Kalodner is "the employer of an independent contractor" and he stood in the same relationship to the workman in that case as did the City to the decedents in the case at bar.

be liable for injuries to the contractor's employees if the land owner has *either* (1) *retained control* of the work or (2) *actually exercised control* or interfered with the work to such an extent as to have assumed control, *and* if his failure to exercise that control in a reasonably prudent manner is a proximate cause of injury. Quinones v. Township of Upper Moreland, 293 F.2d 237, 241 (3rd Cir., 1961), Jamison v. A. M. Byers Co., 330 F.2d 657, 658–660 (3rd Cir., 1964). Restatement 2d, Torts, §§ 414, 416 (1965).

The City anchors its argument on the following language quoted at page 19 of its brief from Silveus v. Grossman, 307 Pa. 272, 161 A. 362 (1932):

"The very phrase 'independent contractor' implies that the contractor is independent in the manner of doing the work contracted for. How can the other party control the contractor who is engaged to do the work, and who presumably knows more about doing it than the man who by contract authorized him to do it? Responsibility goes with authority." 307 Pa. at 277–278, 161 A. at 364.

In that case defendant's building was destroyed by fire which left only one wall standing. Thereafter, at the direction of the Borough authorities he hired a builder to remove the wall, which was menacing plaintiff's adjacent property. In the course of the work, the wall buckled and collapsed onto plaintiff's property. Plaintiff sued both the defendant-land owner, and the contractor. A jury verdict in favor of plaintiff and against the adjacent land owner was reversed by the Superior Court which ordered that defendant's motion for judgment N.O.V. be granted. On appeal, the Superior Court's decision was affirmed.

In Hader v. Coplay Cement Mfg. Co., 410 Pa. 139, 189 A.2d 271 (1963), the property owner, Coplay, a cement manufacturer, purchased a stone crushing machine from Kennedy, and hired Kiefriter to build a structure to house the machine and to install it. Under the contract, Coplay could make use of any of the technical employees of Kennedy to superintend the erection or operation of the machinery. At such times Coplay would pay the employer according to a payment schedule under the contract.

Coplay under those provisions, "borrowed" one Warfield from Kennedy and during this period, plaintiff, Hader, an employee of Kiefriter, was injured while working on the construction. Hader sued Coplay and the trial court awarded a non-suit to Coplay.

On appeal, the Supreme Court affirmed, declaring:

" * * * The common sense of this arrangement is apparent. Coplay, a cement manufacturer, lacking knowledge in its organization of the *manner* of *installation* (emphasis supplied) of a stone crusher, availed itself of the services of one who was familiar with the manner in which a stone crusher should be installed, so that Coplay might be assured that Keifriter—with whom Coplay had contracted to install the crusher—was installing the crusher in accordance with the plans and specifications and in a proper and workmanlike manner. * * *

" * * * An examination of the record clearly reveals that Warfield was acting as a 'watchdog' for Coplay to make sure that Keifriter installed the crusher and erected the housing in accordance with the plans and specifications. * * * Warfield's presence on the job site on behalf of Coplay and the functions which he performed in nowise demonstrated any control by Coplay of the manner of installation of the crusher." 410 Pa. at 147, 189 A.2d at 275–278.

" * * * Spinozzi [Pennsylvania Threshermen & Farmer's Mut. Cas. Ins. Co., Intervenor] v. E. J. Lavino and Co., * * * and Quinones v. Township of Upper Moreland * * * are clearly distinguishable on their facts from the case at bar." 410 Pa. at 271, 189 A.2d at 279.

In Celender v. Allegheny County Sanitary Authority, 208 Pa.Super. 390, 222

A.2d 461 (1966),[5] plaintiffs were employed by a contractor, Mole, as concrete finishers on a sewer construction project for the defendant. The Authority had been created to provide for the development of a new sewer disposal system for the county. In pursuance of this purpose some twenty contracts were let for different phases of the work. The Authority did have an inspector for each contract, but did not control the method of carrying out the work. The two functions of the inspector were (1) to see that the plans and specifications were being carried out, and (2) to see that adequate safety precautions were taken.[6]

On the day of the accident, plaintiffs were travelling from one assigned job site to another and stopped at an underground structure, known as "Vault U-1", to look for a rubbing stone that one of the plaintiffs had left there previously. It being dark in the chamber, one of the plaintiffs struck a match. Gas in the chamber ignited, and the men were severely burned. At that time, Vault U-1 was not being worked, and in fact, its entrance was covered and surrounded by a wire fence. No one knew that the plaintiffs or any other workmen would be there.[7]

A non-suit was granted to the Authority at the close of plaintiff's case. In denying plaintiff's motion for removal of the non-suit, the Court of Common Pleas held:

> " * * * The contractor was in charge of the work. The particular structure where the accident occurred was capped on * * * [the day of the accident.] The men removed this cap and went in to search for a tool. The Authority is entirely too remote from this operation * * *. It neither knew nor should have known that the men would enter the structure that day.
>
> " * * * In the case at bar we can find no evidence whatsoever of control of the premises by the Authority. The

last witness for the plaintiffs * * * testified that he had been employed by the Authority as an inspector and had, on a number of occasions ordered certain precautionary measures to be taken by the contractor. It appears from his entire testimony however, that he * * * had no right to stop work but only to report conditions to his supervisor * * * "

> "We are unable to find in this record even a scintilla of evidence of negligence on the part of the Authority * * *."[8]

The Superior Court affirmed, based principally on the authority of Hader v. Coplay, supra, and distinguishing the rule set out in Section 414 of Restatement, 2d, Torts on the basis of comment C thereto.

Analysis of the facts and both opinions[9] in Celender reveal two facts which distinguish it from the case at bar.

1. The Authority, not being expert itself, retained only such supervisory control as it needed to see to it that it got the finished product for which it had contracted, and to try to protect the workmen from undue risk of injury.

2. Regardless of how this control is characterized, the plaintiffs failed to introduce any evidence that it was not exercised in a reasonably prudent manner or that there was any reasonable relationship between the exercise of that control and the accident.

Similarly, in Peter v. Public Constructors, Inc., 368 F.2d 111 (3rd Cir. 1966) although the general contractor might have chosen to reserve control of the " * * * details of the independent contractor's performance * * * "—in which case he might have been liable for " * * * negligence in the execution of the work * * *," 368 F.2d at 113, the Court found that the general contractor *in fact did not retain nor exercise such control.*

> "The present record contains no evidence of *actual exercise of control* by

---

5. Page citations "(R )" are to the Common Pleas Court Record on Appeal to the Superior Court.

6. R. 350(a).

7. R. 358(a).

8. R. 360(a)–362(a).

9. Allocatur Denied, Feb. 13, 1967.

Public [general contractor] over [subcontractor] Reid's performance of the bridge demolition project. Accordingly, the trial court properly found that there was in fact no such exercise of control.

"We think it equally clear that, in *contracting* with Reid, Public did not *reserve a right to control* the way in which Reid would conduct its operations * * *." 368 F.2d at 113 (Emphasis added.)

2. *Reservation of Control Under the Contract With Driscoll.*

From the uncontroverted competent evidence of record in the case at bar it is abundantly clear that the City retained the right to control the manner and method of performance by the contractor of the contract, and that its negligent exercise of that control bore a direct, foreseeable, causal relationship to the deaths of the decedents.

So clear are the facts that but for the question of the jury's finding that the City's conduct was in reckless disregard of the safety of others,[10] I would not set out these details.

Based on its many years of experience in the design and supervision of sewer construction, the City Water Department maintained its own Design Division—which prepared the plans and specifications for this project—and its own Construction Division which designated engineers and inspectors to supervise the actual construction. The plans and specifications,[11] as prepared by the Design Division, contained the following detailed provisions covering the manner and method of performance by the contractor and the daily supervisory control to be exercised by the City during the continuation of the project:

"Standard Contract Requirements.

"16. Definitions—* * *

" 'Engineer' to mean either the Chief Engineer of the Department for which work is done * * * or any deputy * * *

" 'Inspector' to mean the representative of the Engineer assigned to the inspection of materials and *workmanship* under the contract." (p. 4.) (Emphasis added.) [12]

"19. Contractor's Obligation—

" * * * If at any time the Contractor's *methods force or equipment appear to the Engineer to be unsafe, insufficient or inadequate* for the proper performance of the provisions of the contract, he may *order the Contractor to make such changes as he may deem necessary, and the Contractor shall comply* with such orders * * *" (p. 6.) (Emphasis added).

"32. Status and Authority of Engineer—The Engineer shall have *general supervision and direction of the work,* the interpretation of the Plans and Specifications, *the ordering of additions to or deductions from the work,* and *the determination of procedure.* He shall give all *orders and directions* contemplated under the contract * * He shall determine all other questions that may arise in relation to the execution of the work. *He shall have authority to halt the work whenever such action may be necessary to secure the safe and proper execution of the contract * * *"* (p. 6) (Emphasis added.)

"42. Inspection—*All of the work* of the contract *shall be subject to the supervision and inspection of the Engineer* or his designated representatives, and the contractor shall afford every facility for the *inspection of materials and workmanship.* * * * *Authorized representatives of the Department shall be permitted access at all reasonable times to all portions of the work* * * * No materials shall be used on the work until accepted by the Engineer and all materials rejected by the Engineer as unsuitable or not in conformity with the Plans and Specifications shall be immediately removed from the work. * * * *All work shall be presented in the pres-*

---

10. Jury's Answer to Interrogatory 20(a).

11. Exhibit P–30/DC–57.

12. Page citations are to the City's Standard Contract Requirements.

*ence of the Inspector.* \* \* \* Work shall be done *only during regular working hours* unless specifically *authorized or directed otherwise by the Engineer.* \* \* \*" (p. 9) (Emphasis added.)

"49. Prosecution of the Work—*The method of procedure shall be subject to approval as best adopted for the safe, efficient, and expeditious prosecution of the work,* with a minimum of interference with public traffic and convenience. *Work shall be performed at such times and at such places as may be ordered or approved by the Engineer.* \* \* \*" (p. 9.) (Emphasis added.)

"54. Construction, Methods to be Approved—Before commencing work, the contractor shall, when required by the Engineer, submit for approval his proposed methods of prosecuting the work \* \* \*" (p. 10)

In addition to these examples of continuing control by the City, the Special Specifications of the Contract contain particularly detailed requirements as to the actual work of constructing the sewer.[13]

I find it difficult to conceive of a greater reservation of control by the City of both the manner and method of the work and of the day-to-day supervision.

My conclusion is further supported by the testimony of Water Commissioner Samuel Baxter,[14] and Samuel Wilson,[15] head of the Construction Division, as to their understanding of the City's rights and responsibilities under the contract to see that the contractor had proper equipment, took adequate safety precautions, provided adequate supervision, and to stop the job if necessary to protect the workmen.

■ The conclusion is thus unavoidable that as a matter of law the City, through its contract with Driscoll, retained the right to control the manner and method of the latter's performance.

3. *Negligence By The City In The Exercise of Control.*

■ The jury's answer to interrogatory 2(A) speaks for itself. There can be no doubt that the evidence, as set out above supports that conclusion.

4. *Proximate Cause.*

Here, too, the jury's answer to interrogatory 2(B) speaks for itself and is supported by the evidence. Furthermore, since in every possible explanation of the accident about which there was any evidence, the presence of a dangerous level of gaseous vapors was an essential ingredient, there is no need to consider the question of sufficiency of proof as between several possible causes.[16]

C. SUPERSEDING CAUSE TO RELIEVE THE CITY FROM LIABILITY.

" \* \* \* So long as no person was permitted to enter the tunnel to work ·therein, the failure to comply with the regulations would have harmed no one. However, as soon as persons were permitted to work in the tunnel, Driscoll had a duty to see that its workmen had proper gas masks or blowers powerful enough to exhaust and bring in clear air into (sic) the tunnel \* \* \*." Brief of City of Philadelphia re its Motions for Judgment N.O.V., et seq., at 32.

Defendant, City of Philadelphia's argument, considered in the light of the uncontroverted facts in this case is tantamount to saying that it had the right to gamble its liability for injury to the workmen on the infinitesimal chance that there would be no accident; and that, if there were, Driscroll, alone, would be held liable.

" \* \* \* The law is not so unaware of reality that it will permit a tort-

13. Special Specifications: p. 12—Working Shaft Locations; p. 12—Lines and Grades in Tunnel; p. 13—Steel Liner Plates and Ribs; p. 17—Placing Concrete and Grout; pp. 17–18—Vacuum Processing in Tunnel.

14. N.T., 2190, 94, 96.

15. N.T., 458–59, 461, 71, 73, 80, 81–85.

16. See Marrazzo v. Scranton Nehi Bottling Co., 422 Pa. 518, 223 A.2d 17 (1966).

feasor to turn his wrongful act into an immunity by asserting that the eventual damage resulted from a more immediate cause when it is clear that this immediate cause was put into operation by his own tortious conduct." Thornton v. Weaber, 380 Pa. 590, 112 A.2d 344 (1955).

■ An intervening negligent act or omission which combines with a prior negligent act or omission to cause an accident will relieve the former from liability only where the latter

" * * * was so extraordinary as not to have been reasonably foreseeable, and * * * [unlike the basis for determining foreseeability with respect to direct negligence] whether the act was reasonably foreseeable [is] to be determined by following retrospectively the sequence of events and looking back from the harm to the negligent act rather than by considering whether the defendant should prospectively have envisaged the events which unfolded and caused the accident." Wilson v. American Chain and Cable Co., 364 F.2d 558, 562 (3rd Cir., 1966); Shimer v. Bangor Gas Co., 410 Pa. 92, 97, 188 A.2d 734 (1963).

■ I have found nothing in the record nor in the briefs and arguments of counsel that would lead me to set aside the jury's findings,[17] that there was no superseding cause which, under the law, could relieve the City from liability.

## D. LIABILITY OF ATLANTIC

### 1. *Superseding Cause*

Unlike the question of the relationship between Driscoll's conduct and the City's liability, the question of the City's conduct and Atlantic's liability [18] falls squarely within the rules governing superseding cause, as enunciated by the

Pennsylvania Courts, the Court of Appeals for the Third Circuit, and the Restatement.

In Kline v. Moyer, 325 Pa. 357, 191 A. 43, 111 A.L.R. 406 (1937), the defendant, Albert, had been driving on the highway towards Reading when the rear axle on his truck broke. Being alone, he left the truck and went to seek assistance. All four wheels were on the roadway. Thereafter, defendant, Moyer, proceeding in the same direction approached Albert's vehicle. He was unable to stop in time to avoid hitting it and swerved into the oncoming traffic lane, striking the car in which plaintiff was a passenger. Plaintiff sued and recovered a verdict against both defendants. The trial court granted Albert's motion for judgment N.O.V. and plaintiff appealed.

Mr. Justice (later Chief Justice) Stern for the court reviewed a number of cases involving prior and subsequent acts of negligence leading to an injury to a third party. He found the cases distinguishable based on whether or not, at the time the subsequent actor was negligent he had knowledge of the dangerous condition created by the prior act. In remanding the case for a new trial to determine whether Moyer's conduct was negligent *after* he became aware of presence of Albert's vehicle, he said:

" * * * We would formulate the general principle as follows: Where a second actor has become aware of the existence of a potential danger created by the negligence of an original tortfeasor, and thereafter, by an independent act of negligence, brings about an accident, the first tort-feasor is relieved of liability, because the condition created by him was merely a circumstance of the accident and not its

17. Jury's answers to interrogatories 5 and 7.

18. The City bases its claim on the allegation that Atlantic is liable without proof of negligence because its conduct in operating the tank farm was an ultrahazardous activity and because the seepage of petroleum products into soil in which the sewer was being con-

structed constituted trespass and/or nuisance. It is further argued that this liability renders Atlantic a joint tortfeasor. For purposes of this discussion, I assume, without deciding, the correctness of all of these propositions. However, they are discussed individually, infra.

proximate cause. * * *" 325 Pa. at 364, 191 A. at 46.[19]

This rule has been somewhat modified.

An intervening negligent act is not always a superseding cause which relieves an antecedent wrongdoer from liability for negligently creating a dangerous condition which results in injury. In determining whether an intervening force is a superseding cause, the Pennsylvania Supreme Court in Hendricks v. Pyramid Motor Freight Corp., 328 Pa. 570, 574, 195 A. 907, 909, stated:

"The answer to this inquiry depends on whether the (intervening) conduct was so extraordinary as not to have been reasonably foreseeable, or whether it was reasonably to be anticipated * * *."

See also Stark v. Lehigh Foundries, Inc., 388 Pa. 1, 11, 130 A.2d 123, 130 (1957); Leposki v. Railway Express Agency, 297 F.2d 849, 850 (3rd Cir. 1962); Wilson v. American Chain and Cable Co., 364 F.2d 558, 561 (3rd Cir., 1966).

Sections 442, 443 and 447 of Restatement, 2d, Torts provide the factors relevant to the determination of whether or not an intervening[20] act constitutes a superseding cause that would relieve Atlantic of liability.

There is no need to discuss each section and the comments thereto in detail, since the instant facts permit neither question nor dispute. The degree to which the City's conduct was extraordinary is, perhaps, best highlighted by the fact that the jury considered it so grossly negligent as to amount to a reckless disregard of the safety of others.

 I find as a matter of law that the City's conduct, after the alleged seepage of Atlantic's petroleum products into the ground under the highway, and after the City had knowledge of the invasion and of the danger created thereby, was so extraordinary as not to have been reasonably foreseeable and thus would be a superseding cause of the injuries and deaths of decedents.

2. *Trespass*

Assuming, without deciding that the evidence would support findings that the petroleum products which ignited in the tunnel causing the explosion and fire in which decedents were killed came, in whole or in part, from Atlantic's property, the invasion was not an invasion of any right of the decedents.

 Kopka v. Bell Telephone Co., 371 Pa. 444, 91 A.2d 232 (1952) holds that consequential damages to the owner of the property are recoverable in an action for trespass to the property, and the Restatement 2d, Torts, § 162 (1965) extends liability to members of the household of the possessor. However, in keeping with the basic principle that actions for trespass to land are primarily to redress invasions of the right to exclusive use and possession thereof,[21] the Restatement expresses no opinion as to liability to *servants of the possessor* who, though not members of his household are nevertheless *resident* thereon.

 Decedents herein were neither the servants nor employees of the possessor—the City—nor resident on the property.[22]

While I have found no Pennsylvania cases dealing with injuries to persons bearing such relationship to the possessor of land arising out of non-negligent, trespassory intrusion to the land, I do not believe that the Courts of the Commonwealth would extend *Kopka* and the

---

19. In a footnote, Mr. Justice Stern approved § 447 of Restatement of Torts and went on to say that the first actor could not reasonably foresee "an act of negligence committed by the second actor *after* acquiring knowledge of the danger," and that such a subsequent act of negligence would be "extraordinary" and not a "normal response."

20. There is no evidence of any leakage, spillage or seepage on Atlantic's property at any particular time; certainly not at any time after the commencement of this project.

21. Restatement 2d, Torts (1965), Scope Note to Chapter 7.

22. Even as to Section 165, Comment C limits liability to harm "connected with his interest of exclusive possession. These interests include those in bodily security and freedom from confinement, * * * and the physical condition of the members of his family and the servants belonging to his household

Restatement rule to permit these plaintiffs to recover from Atlantic.

3. *Nuisance.*

The applicable law under the doctrine of "nuisance" was clearly defined by the Pennsylvania Supreme Court in the case of Waschak v. Moffat, 379 Pa. 441, 109 A.2d 310, 54 A.L.R.2d 748 (1954), where it was held:

"It is our view that [Restatement, Torts] Section 822 comprehensively encompasses the entire statement of principles of liability * * *." Id., 379 Pa. at 454, 109 A.2d at 317.

Section 822 reads as follows:

The actor is liable in an action for damages for a non-trespassory invasion of another's interest in the private use and enjoyment of land if,

(a) The other has property rights and privileges in respect to the use or enjoyment interfered with; and

(b) the invasion is substantial; and

(c) the actor's conduct is a legal cause of the invasion; and

(d) The invasion is either

(i) intentional and unreasonable; or

(ii) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultrahazardous conduct." Restatement, Torts, § 822 (1939).

Section 823 defines "Persons Who Can Maintain an Action".

Section 825 defines "Intentional Invasion * * *".

Sections 826 through 831 define and set out rules for balancing "gravity v. utility" for purposes of determining when the invasion is "unreasonable."

▮ My review of the record reveals not the slightest bit of evidence from which it could be determined that the

decedents had "property rights and privileges in respect to the use or enjoyment interfered with" nor that the presence of petroleum products in the soil were, with respect to Atlantic, either avoidable or otherwise unreasonable. Thus, I find that the plaintiffs and the City having failed to provide any evidence that Atlantic had created or maintained a nuisance which invaded any right of the decedents herein and which contributed to this accident, the City has no right to contribution from Atlantic.

4. *Ultrahazardous Activity*

Chapter 21 (§§ 519–24) Restatement, Torts, dealing with Ultrahazardous Activities, has been adopted in Pennsylvania. See Fedorff v. Harrison Const. Co., 362 Pa. 181, 66 A.2d 817 (1949), Haddon v. Lotito, 399 Pa. 521, 161 A.2d 160, 81 A.L.R.2d 1199 (1960), McSparran v. Hanigan Const. Co., 225 F.Supp. 628 (E.D.Pa., 1963). However, we have been able to find no cases in Pennsylvania or in this Circuit determining whether or not the maintenance of a petroleum tank farm in an industrial, non-residential area is per se an ultrahazardous activity within the meaning of § 520.[23]

In the case at bar the only testimony even tangentially relevant to the question of ultrahazardous activity was (1) Mr. Wakeley's testimony that the petroleum products indicated on the spectorgraph appeared to be like those stored at Atlantic (N.T., 1316); and (2) the general knowledge that the ground at or near refineries and tank farms was likely to be saturated with petroleum products. (N.T., 577, 179, 80, 83, 2200.)

There was no evidence of the practices employed by Atlantic or known and employed by others in the trade nor of the effect that such practices might have on leakage, spillage or seepage of petro-

---

* * *" No evidence whatsoever was introduced from which it could be said that decedents were within any of the stated categories nor that the alleged trespass by Atlantic could reasonably have been expected to invade any *such* interest. Additionally, as the discussion below states, there is no evidence that this is an ultra-hazardous activity with-

in the meaning of sections 519 and 520, Restatement, Torts, (1938).

23. Restatement, Torts, § 520: "An activity is ultrahazardous if it (a) necessarily involves a risk of serious harm to person, land or chattels of others which cannot be eliminated by the exercise of the utmost care, and (b) is not a matter of common usage."

leum. There was no testimony from which the dangerousness of a tank farm could be distinguished from that of a large service station, or other business which involves the storage of large quantities of petroleum products. See Pryor v. Chambersberg Oil & Gas Co., 376 Pa. 521, 526, 103 A.2d 425, 427–428 (1954); Beck v. Bel Air Properties, 134 Cal.App. 2d 834, 839, 286 P.2d 503, 509 (1955).

■ Thus, there was no factual basis from which either the Court or the jury could have found that Atlantic's operation constituted an ultrahazardous activity.

## E. CONTRIBUTORY NEGLIGENCE

Throughout the trial, counsel for the City brought up that an employee of Driscoll, Mr. Steel, who went into the tunnel with one of the first rescue teams stated that he had found an opened package of cigarettes in the tunnel. Despite repeated assurances to the court that this would be tried in, not one additional fact was brought out to establish that any of the deceased men brought the cigarettes into the tunnel, or had smoked in the tunnel and if so which one and whether or not such smoking had actually caused this accident. To the contrary, Mr. Gass, the City Engineer, testified that he went into the tunnel and saw the pack of cigarettes after the time at which Steel was alleged to have brought them up. (N.T., 1609, 15, 30–32; 2172–73.)

After careful examination of the entire transcript, I am constrained to state that the errors committed at trial with respect to this issue, if any there were, were in not requiring counsel for the City to state with greater precision how it would tie this evidence in as a possible cause of the accident and in the absence of such further evidence not to have withdrawn the matter from the jury's consideration.[24] See Papa v. Pittsburgh

24. It should be noted that the jury's conclusion that the City's conduct amounted to a reckless disregard of the rights of others precludes, of itself, the granting of defendant's motions on the alleged ground of contributory negligence. See

Penn-Center Corp., 421 Pa. 228, 218 A. 2d 783 (1966).

## F. ASSUMPTION OF RISK

■ (1) The defense of assumption of risk is not available to one other than the employer of the injured employee seeking recovery. Kulka v. Nemirovsky, 314 Pa. 134, 139, 170 A. 261 (1934); Stark v. Lehigh Foundries, Inc., 388 Pa. 1, 130 A.2d 123 (1957). See also Grantham, J., concurring in Thrussell v. Handyside, 20 Q.B.D. 359, 367 (1888).

(2) "It cannot be said, where a man is lawfully engaged in his work, and is in danger of dismissal if he leaves his work, that he wilfully incurs any risk which he may encounter in the course of such. * * * It is different where there is no duty to be performed, and a man takes his chance of danger, for there he voluntarily encounters the risk. If the plaintiff could have gone away from the dangerous place without incurring the risk of losing his means of livelihood, the case might have been different; but he was obliged to be there, his poverty not his will consented to incur the danger." Thrussell v. Handyside, id. at 364.

All of the decedents in this case were working men. Typically, they relied on their regular pay checks to afford the necessities of daily living and to provide for their families. Also typically, they could ill afford to refuse to work in the tunnel when assigned to do so—even assuming that they knew that it involved a serious danger of fire and explosion—on the mere chance that their refusal would be vindicated at a later date and they would then be reimbursed for any loss of pay. See Falyk v. Penna. R. R. Co., 256 Pa. 397, 400, 100 A. 961 (1917).

(3) " * * * There may be a perception of the existence of a danger without appreciation of the risk * *

Kasanovich v. George, 348 Pa. 199, 134 A.2d 523 (1943); Parker v. Jones, 423 Pa. 15, 223 A.2d 229 (1966); Wilson v. American Chain and Cable Co., 364 F.2d 558, 562 (3rd Cir. 1966).

Yarmouth v. France (1887) 19 Q.B.D. 647.

While the workmen may have smelled gas fumes and known that they became lightheaded or nauseous from working in the tunnel, there was no evidence that they knew or should have known (a) that the vapors were at or near the explosive limit; (b) that a random spark from any source could cause a flash fire and explosion, and (c) that the equipment being used was likely to create such a spark.

The evidence is only that the odor of petroleum permeated the area. But, there was not one shred of evidence that this odor or the training or the experience of the decedents was such that they " * * * appreciate[d] the danger itself and the nature, character and extent which made it unreasonable * * *." Restatement 2d, Torts, § 496(D), Comment (b) (1965); Falyk, supra, at 401, 100 A. 961; Madden v. Lehigh Valley R. R. Co., 236 Pa. 104, 109, 84 A. 672 (1912); Valjago v. Carnegie Steel Co., 226 Pa. 514, 519–520, 75 A. 728 (1910). See also Restatement 2d, Torts, § 496 (D), Comment (c) and § 496(c), Illustration 7 to Comment (i).

 In view of the above, the error with respect to this issue, if any, as with the issue of contributory negligence, was in submitting the question to the jury for its consideration rather than ruling in favor of the plaintiffs as a matter of law. Nevertheless, since the jury has spoken and the evidence clearly supports their determination, the matter is closed.

## G. PUNITIVE DAMAGES

### 1. *Under the Facts of This Case.*

"Although under Pennsylvania law a punitive award may be made against a corporation for an employee's tort, the conduct of the agent must be clearly outrageous to justify vicarious imposition of exemplary damages upon the principal. (citing cases) * * *

" 'Punitive damages' are penal in character, * * * and are allowed only when defendant is guilty of * *

such reckless disregard of the rights of others as to raise a necessary presumption on conscious indifference to consequences. * * * " (Brief of Defendant, City of Philadelphia, at 61.)

 I accept defendant's statement of the law as noted above. However, the jury, which listened to all of the testimony and considered all of the evidence, under appropriate instructions, concluded that the City's conduct did amount to that degree of "reckless disregard of the safety of others."[25] Having carefully reviewed the record, I see no reason to set aside that finding.

### 2. *Punitive Damages Against a Municipality.*

No Pennsylvania cases have been found expressly allowing or rejecting an award for punitive damages against a municipality. However, I do think that the cases shed substantial light on the problem.

In New Castle Products, Inc. v. School District of Blair Township, 18 F.Supp. 335 (W.D.Pa.1936), an action based on diversity of citizenship seeking compensatory and punitive damages for conversion was dismissed for want of the $3,000 jurisdictional amount. The materials converted were valued at approximately $2,000, and the balance of plaintiff's claim for $3500 was based on punitive damages. In dismissing the case, the District Court ruled that punitive damages were not recoverable. Several factors, however, distinguish that case in such a manner as to support a decision allowing punitive damages in the case at bar.

(a) *New Castle Products* was decided prior to the decision of the United States Supreme Court in Erie R. Co. v. Tomkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) which held that in diversity cases the District Court was bound to apply the law that a state court in the forum state would have applied had the case been tried there. At that time, the federal district courts were free to ig-

25. Jury's answer to interrogatory 20(a).

nore the state rules, and fashion a general federal common law, see Swift v. Tyson, 16 Pet. (41 U.S.) 1, 10 L.Ed. 865 (1842), which is exactly what the court in *New Castle Products* did:

"* * * The question of the liability of a municipal corporation, or a quasi municipal corporation, for punitive damages has not been passed upon by the appellate courts of Pennsylvania. There is dicta indicating such liability by municipal corporations. Armstrong & Latta v. City of Philadelphia, 249 Pa. 39, 94 A. 455 (1915) * * *; Spencer v. Carlisle Borough, 63 Pa.Super. 513. See Hermits of St. Augustine v. County of Philadelphia, Brightly N.P. (Pa.) 116 (4 Clerk 120, 7 Pa. L.J. 124); Howell v. Borough of West Chester, 26 Lanc.Law Rev. (Pa.) 201. * * *

"The great weight of authority outside of Pennsylvania is to the effect that municipal corporations are not liable for punitive damages. * * *

"I am in accord with the [latter] * * * view * * *." New Castle Products, supra, 18 F.Supp. at 336–337.

Thus it would seem, that to the extent that there was authority in the Pennsylvania courts on this point, that authority would hold the City to be liable for punitive damages.

(b) The court either assumed or decided that the defendant, School District of Blair Township, was engaged in the performance of a *governmental* function. (Emphasis added.) In the case at bar, the City was engaged in a proprietary function. Quinones v. Township of Upper Moreland, 293 F.2d 237 (3rd Cir., 1961).

In light of the wording of the City Ordinance waiving any immunity from tort liability of the City—even for governmental functions—that injured persons

"* * * shall have the right to bring suit against the City *in accord-*

*ance with the same rules of law* as applied by the Courts of this Commonwealth *against any other party defendant. * * *"* Philadelphia Code, Ch. 21–700 (1962). (Emphasis added.)

and in light of the recent decisions of the Pennsylvania Supreme Court removing immunity from tort liability from charitable institutions,[26] I believe that the Pennsylvania courts, were they now to consider the question of liability of the City of Philadelphia for punitive damages growing out of its conduct of a non-governmental function, would hold, as I do here, that the City should be liable.

3. *Under The Survival Act.*

The Survival Act [27] specifically states:

"All causes of action or proceedings, real or personal, except actions for slander or libel, shall survive the death of the plaintiff * * *."

No mention is made of damages per se. We see no reason to read into the act a limitation on the nature or amount of recovery. Certainly, the legislature was aware that the courts of Pennsylvania recognized punitive damages in an appropriate case, when they passed the act. See Thompson v. Swank, 317 Pa. 158, 176 A. 211 (1934); Adelman v. Rosenbaum, 133 Pa.Super. 386, 3 A.2d 15 (1938); Hughes v. Babcock, 349 Pa. 475, 37 A.2d 551 (1944).

Furthermore, since the function of punitive damages is to punish outrageous conduct and to discourage similar conduct in the future, Restatement, Torts, § 908, Comment (a) (1939), it would appear to be inconsistent to disallow such an award where the conduct of the defendant is not only reprehensible but in fact results in death.

H. ATLANTIC'S CROSS CLAIM AGAINST THE CITY.

Atlantic argues that under § 97 of the Restatement of Restitution,[28] had they been found negligent, since the jury found the City in reckless disregard of

26. See Flagiello v. Pennsylvania Hospital, 417 Pa. 486, 208 A.2d 193 (1965).

27. 20 Pa.Stat.Ann. § 320.601 (1949).

28. "A person whose negligent conduct combined with the reckless . . . conduct of another has resulted in injury for which both have become liable

684

the safety of others,[29] they would have been entitled to restitution from the City for the amount of their payment to the plaintiffs plus reasonable counsel fees,[30] and that *a fortiori*, since they were found not negligent they should be entitled to recover. This statement, however, begs the question for, as Comment (a) to § 97 states:

"The rule stated in this section applies where the circumstances are such that both the payor and the other are liable to the injured person * * *"

Similarly, in Orth v. Consumers Gas Co., 280 Pa. 118, 124 A. 296 (1924), plaintiff's verdict against the Gas Company for indemnity *followed* the suit by injured parties against him in which *his liability was established* by an adverse verdict.[31] The Pennsylvania Supreme Court characterized the plaintiff's right as the right of one

" * * * who has been *compelled* to pay damages for a default arising out of the wrongful act of another—to recover indemnity from the persons whose initial negligence was the primary cause of the injury. (citing authority) * * *." (Emphasis added.) Id. at 121, 124 A. at 297.

■ In the case at bar, however, no liability on the part of Atlantic had been established at the time of their settlement with the plaintiffs. Thus, unlike the plaintiff in the case of Philadelphia Co. v. Central Traction Co., 165 Pa. 456, 461–462, 466, 30 A. 934 (1895)—where a settlement of less than the amount of the verdict was made prior to appeal, and the defendant in the first case then sued for indemnification—Atlantic, here, was a volunteer.

In addition, Atlantic as is shown by its settlement with the plaintiff, believed that there was a possibility that the jury would find that they had been negligent also, and that the City had not been guilty of recklessness. In the face of the possibility of greater liability—as against the possibility of no liability—they agreed to a fixed payment. Such is the basis of most, if not all, settlements, and where there are multiple parties each tries to time his offer to get the best terms for his party.

Viewed in that light, Atlantic's claim is that the City, by not settling what it must have known from the discovery to have been a legitimate claim, required Atlantic to go to the expense of this extended litigation—not to pay the amount of the settlement.

Nevertheless, Atlantic urges that assessing the City in this case for the amount of their settlement plus their costs of litigation will encourage settlements and discourage unreasonable refusal to settle where there are multiple defendants.[32]

However, such a rule would generate additional litigation. In every case in which after one co-defendant settles and is found not reckless the non-settling co-defendant is found reckless and is called on to indemnify the other, the non-settling co-defendant would seek to litigate the reasonableness of his refusal to settle.

For the reasons thus stated, Atlantic's motion for judgment on its cross claim against the City, and all of the City's motions for directed verdict and to set aside the verdict have been denied.

30. See Orth v. Consumers Gas Co., 280 Pa. 118, 121, 124 A. 296 (1924).

31. Id. at 120, 124 A. 296.

32. Atlantic makes no suggestion as to whether or not the rule they espouse, insofar as it applies to the costs of litigation, should inure to the benefit of plaintiffs also.

in fact to a third person is entitled to indemnity from the other for expenditures properly made in the discharge of such liability, if the other knew of the peril and could have averted the harm at a time when the negligent tortfeasor could not have done so." Restatement, Restitution, § 97 (1936).

29. Answer to Special Interrogatory 20(a).

## APPENDIX

### INTERROGATORIES TO BE SUBMITTED TO THE JURY

#### PART I.

#### NEGLIGENCE AND PROXIMATE CAUSE

1(A) WAS THE CITY OF PHILADELPHIA NEGLI- YES____X____
GENT

IN RESPECT TO THE DESIGN OF THE SEW- NO_____
ER?

INSTRUCTIONS: If you have answered 1(A) "Yes", an-
swer 1(B); If you have answered 1(A)
"NO", DO NOT answer 1(B).

1(B) WAS SUCH NEGLIGENCE A PROXIMATE YES____X____
CAUSE OF THE ACCIDENT? NO_____

2(A) WAS THE CITY NEGLIGENT IN RESPECT TO YES____X____
THE ACCUMULATION OF GASEOUS VAPORS? NO_____

INSTRUCTIONS: If you have answered 2(A) "Yes", an-
swer 2(B); If you have answered 2(A)
"NO", DO NOT answer 2(B).

2(B) WAS SUCH NEGLIGENCE A PROXIMATE YES____X____
CAUSE OF THE ACCIDENT? NO_____

3(A) WAS THE DRISCOLL CONSTRUCTION COM- YES____X____
PANY NEGLIGENT? NO_____

INSTRUCTIONS: If you have answered 3(A) "Yes", an-
swer 3(B); If you have answered 3(A)
"NO", DO NOT answer 4(B).

3(B) WAS SUCH NEGLIGENCE A PROXIMATE YES____X____
CAUSE OF THE ACCIDENT? NO_____

4(A) WAS ATLANTIC REFINING COMPANY NEG- YES_____
LIGENT? NO____X____

INSTRUCTIONS: If you have answered 4(A) "Yes", an-
swer 4(B); If you have answered 4(A)
"NO, DO NOT answer 4(B).

4(B) WAS SUCH NEGLIGENCE A PROXIMATE YES_____
CAUSE OF THE ACCIDENT? NO _____

## II.

### SUPERSEDING CAUSE RE NEGLIGENCE

INSTRUCTIONS: If you have answered questions 1(A) "Yes" and 1(B) "Yes", and 3(A) "Yes" and 3(B) "Yes", answer this question No. 5. If you have answered any one or more of them "NO", DO NOT answer this question No. 5.

5. WAS THE NEGLIGENCE OF DRISCOLL CONSTRUCTION COMPANY, INC., WHICH YOU HAVE FOUND IN ANSWERING QUESTION 3(A) "YES", A SUPERSEDING CAUSE OF THE ACCIDENT THAT WOULD RELIEVE THE CITY OF LIABILITY FOR ANY NEGLIGENCE WITH RESPECT TO DESIGNING THE SEWER?

YES _____

NO ___ X ___

INSTRUCTIONS: If you have answered questions 1(A) "Yes" and 1(B) "YES", and 4(A) "Yes" and 4(B) "Yes", answer this question No. 6. If you have answered any one or more of them "NO", DO NOT answer this question No. 6.

6. WAS THE NEGLIGENCE OF ATLANTIC REFINING COMPANY, WHICH YOU HAVE FOUND IN ANSWERING QUESTION 4(A) "YES", A SUPERSEDING CAUSE OF THE ACCIDENT THAT WOULD RELIEVE THE CITY OF LIABILITY FOR ANY NEGLIGENCE WITH RESPECT TO DESIGNING THE SEWER?

YES _____

NO _____

INSTRUCTIONS: If you have answered questions 2(A) "Yes" and 2(B) "Yes" and 3(A) "Yes" and 3(B) "Yes", then answer this question No. 7. If you have answered any one or more of them "NO", DO NOT answer this question No. 7.

7. WAS THE NEGLIGENCE OF DRISCOLL CONSTRUCTION COMPANY, WHICH YOU HAVE FOUND IN ANSWERING QUESTION 3(A) "YES", A SUPERSEDING CAUSE OF THE ACCIDENT THAT WOULD RELIEVE THE CITY OF LIABILITY FOR ANY NEGLIGENCE WITH RESPECT TO THE ACCUMULATION OF GASEOUS VAPORS?

YES _____

NO ___ X ___

INSTRUCTIONS: If you have answered questions 2(A) "Yes" and 2(B) "Yes", and 4(A) "Yes" and 4(B) "Yes", then answer this question No. 8. If you have answered any one or more of them "NO", DO NOT answer this question No. 8.

8. WAS THE NEGLIGENCE OF THE ATLANTIC REFINING COMPANY, WHICH YOU HAVE FOUND IN ANSWERING QUESTION 4(A) "YES", A SUPERSEDING CAUSE OF THE ACCIDENT, THAT WOULD RELIEVE THE CITY OF LIABILITY FOR ANY NEGLIGENCE WITH RESPECT TO THE ACCUMULATION OF GASEOUS VAPORS?

YES_____

NO_____

INSTRUCTIONS: If you have answered questions 3(A) "Yes" and 3(B) "Yes", and 4(A) "Yes" and 4(B) "Yes", then answer this question No. 9. If you have answered any one or more of them "NO", DO NOT answer this question No. 9.

9. WAS THE NEGLIGENCE OF THE ATLANTIC REFINING COMPANY, WHICH YOU HAVE FOUND IN ANSWERING QUESTION 4(A) "YES", A SUPERSEDING CAUSE OF THE ACCIDENT THAT WOULD RELIEVE THE DRISCOLL CONSTRUCTION COMPANY OF LIABILITY FOR ANY NEGLIGENCE?

YES_____

NO_____

INSTRUCTIONS: If you have answered questions 4(A) "Yes" and 4(B) "Yes" and 1(A) "Yes" and 1(B) "Yes", answer this question No. 10. If you have answered any one or more of them "NO", DO NOT answer this question No. 10.

10. WAS THE NEGLIGENCE OF THE CITY OF PHILADELPHIA WHICH YOU HAVE FOUND IN ANSWERING QUESTION 1(A) "YES" A SUPERSEDING CAUSE THE ACCIDENT THAT WOULD RELIEVE THE ATLANTIC REFINING COMPANY OF LIABILITY FOR ANY NEGLIGENCE?

YES_____

NO_____

INSTRUCTIONS: If you have answered questions 4(A) "Yes" and 4(B) "Yes" and 2(A) "Yes" and 2(B) "Yes", then answer this question No. 11. If you have answered any one or more of them "NO", DO NOT answer this question No. 11.

11. WAS THE NEGLIGENCE OF THE CITY, WHICH YOU HAVE FOUND IN ANSWERING QUESTION 2(A) "YES" A SUPERSEDING CAUSE OF THE ACCIDENT WHICH WOULD RELIEVE THE ATLANTIC REFINING COMPANY OF LIABILITY FOR ANY NEGLIGENCE?

YES_____

NO_____

INSTRUCTIONS: If you have answered questions 4(A) "Yes" and 4(B) "Yes" and 3(A) "Yes" and 3(B) "Yes", then answer this question No. 12. If you have answered any one or more of them "NO", DO NOT answer this question No. 12.

12. WAS THE NEGLIGENCE OF DRISCOLL CON-STRUCTION COMPANY, WHICH YOU HAVE FOUND IN ANSWERING QUESTION 3(A) "YES", A SUPERSEDING CAUSE OF THE ACCIDENT WHICH WOULD RELIEVE THE ATLANTIC RE-FINING COMPANY OF LIABILITY FOR ANY NEGLIGENCE?

YES_____

NO_____

## PART III.

## CONTRIBUTORY NEGLIGENCE AND ASSUMPTION OF RISK

INSTRUCTIONS: Answer all questions from 13 to 18.

13. WAS PLAINTIFF-DECEDENT, JAMES C. HEN-NIGAN, GUILTY OF CONTRIBUTORY NEGLI-GENCE?

YES_____

NO___X___

14. WAS PLAINTIFF-DECEDENT, JOHN RIDDICK, GUILTY OF CONTRIBUTORY NEGLIGENCE?

YES_____

NO___X___

15. WAS PLAINTIFF-DECEDENT, ROBERT C. WIL-SON, GUILTY OF CONTRIBUTORY NEGLI-GENCE?

YES_____

NO___X___

16. DID PLAINTIFF-DECEDENT, JAMES C. HEN-NIGAN, ASSUME THE RISK FOR THE TYPE OF ACCIDENT WHICH CAUSED HIS INJURY AND DEATH?

YES_____

NO___X___

17. DID PLAINTIFF-DECEDENT, ROBERT C. WIL-SON, ASSUME THE RISK FOR THE TYPE OF ACCIDENT WHICH CAUSED HIS INJURY AND DEATH?

YES_____

NO___X___

18. DID PLAINTIFF-DECEDENT, JOHN RIDDICK, ASSUME THE RISK FOR THE TYPE OF ACCI-DENT WHICH CAUSED HIS INJURY AND DEATH?

YES_____

NO___X___

## PART IV.

### RECKLESS DISREGARD OF THE SAFETY OF OTHERS

19(A) DO YOU FIND THAT IN THE DESIGN OF THE
SEWER THE CITY'S CONDUCT WAS A RECK- YES_____
LESS DISREGARD OF THE SAFETY OF OTH-
ERS? NO\_\_\_\_X\_\_\_\_

INSTRUCTIONS: If you have answered 19(A) "Yes", an-
swer 19(B); If you have answered 19
(A) "NO", DO NOT answer 19(B).

19(B) WAS SUCH CONDUCT ONE OF THE PROXI- YES_____
MATE CAUSES OF THE ACCIDENT? NO_____

20(A) IN PERMITTING THE ACCUMULATION OF
GASEOUS VAPORS, DO YOU FIND THAT THE YES\_\_\_\_X\_\_\_\_
CONDUCT OF THE CITY WAS A RECKLESS
DISREGARD OF THE SAFETY OF OTHERS? NO_____

INSTRUCTIONS: If you have answered 20(A) "Yes", an-
swer 20(B); If you have answered 20
(A) "NO", DO NOT answer 20(B).

20(B) WAS SUCH CONDUCT ONE OF THE PROXI- YES\_\_\_\_X\_\_\_\_
MATE CAUSES OF THE ACCIDENT? NO_____

## PART V.

### COMPENSATORY DAMAGES

INSTRUCTIONS: If you have answered 1(A) and 1(B)
"Yes", or 2(A) and 2(B) "Yes", or 3(A)
and 3(B) "Yes", or 4(A) and 4(B)
"Yes", in what amount do you assess
compensatory damages?

(A) HENNIGAN:

SURVIVAL ACTION $101,150.
WRONGFUL DEATH $ 11,270.

(B) RIDDICK:

SURVIVAL ACTION $129,520.
WRONGFUL DEATH $ 8,385.

(C) JOHNSON:
(WILSON)

SURVIVAL ACTION $130,730.
WRONGFUL DEATH $ 8,245.

## PART VI.

### PUNITIVE DAMAGES

INSTRUCTIONS: If you have answered 19(A) and 19(B) "Yes",
and/or 20(A) and 20(B) "Yes", in what amount
do you assess punitive damages?

(A) HENNIGAN ..................$25,000.

(B) RIDDICK ....................$25,000.

(C) JOHNSON ...................$25,000.
(WILSON)