James T. DORSEY

v.

The YODER COMPANY

v.

GENERAL COPPER AND BRASS COMPANY.

Civ. A. No. 43175.

United States District Court,
E. D. Pennsylvania.

Sept. 9, 1971.

Martin Heller, Philadelphia, Pa., for plaintiff.

Peter P. Liebert, 3rd, Philadelphia, Pa., for defendant.

Richard L. Goerwitz, Jr., Philadelphia, Pa., for third party defendant.

## OPINION AND ORDER

MASTERSON, District Judge.

This is a products liability case arising out of personal injuries suffered by the plaintiff, James T. Dorsey, when his right hand and arm were almost severed by the blades of a metal slitter machine which was manufactured by The Yoder Company (hereinafter referred to as Yoder) and owned by his employer, General Copper and Brass Company (hereinafter referred to as General). Diversity of citizenship affords jurisdiction and Pennsylvania law applies.

Plaintiff sued Yoder premising liability upon Sections 402A (Strict Liability) and 398 (Chattel Made Under Dangerous Plan or Design) of the Restatement of Torts, 2d, as well as ordinary negligence. Essentially, plaintiff alleged faulty design by Yoder in that the machine lacked (1) a guard which would prevent a man's hand and arm from reaching the cutters, (2) a cut-off switch which would stop the machine if such a guard were raised, and (3) a table with guides on it located far enough away from the rotary blades so that the operator would not have to place his hands anywhere near the entrance to the cutter.

Yoder joined General as a third-party defendant alleging that in the event of a judgment for the plaintiff, General's negligence in failing to install a guard around the cutters entitled Yoder to indemnification or contribution. The gist of Yoder's contention was that the General Safety Law of Pennsylvania [1] imposed a duty upon General to equip the machine with such a device.

After six days of testimony, the jury returned a verdict of $125,000 for the plaintiff against Yoder, yet declined to hold General liable for contribution or indemnification. In short, the jury judged Yoder solely liable for plaintiff's injuries.

Yoder now moves for judgment n. o. v. against both Dorsey and General and

---

1. 43 P.S. § 25–1 et seq.

alternatively for a new trial. These two motions set forth some sixty alleged errors in the Court's conduct of the trial and the charge to the jury.

After careful consideration, this Court finds for the reasons set forth below that no errors have been committed that require either a new trial or imposition of judgment n. o. v. against plaintiff or General. Moreover, we are convinced that the jury had sufficient evidence to reach all of the factual conclusions necessary to impose liability upon Yoder, and to do so without extending that liability to General. Consequently, both of Yoder's motions must be denied.

## I. FACTS

Since the jury returned verdicts for both plaintiff and General, hornbook law requires this Court to consider the evidence, and all inferences therefrom in a light most favorable to the winning parties. Following this rule, the salient facts surrounding this tragic occurrence may be summarized as follows.

James T. Dorsey began operating metal slitting machines in 1945. Sometime in 1950, he came to work for General. Except for an absence of about 4 years between 1956 and 1960 due to an unrelated illness, he worked continuously for General up until the date of the accident, August 23, 1965.

At that time Dorsey was operating a slitter machine manufactured by Yoder and delivered to General in 1958. Yoder's representatives visited General's plant twice and recommended the machine they felt best suited to General's requirements. The particular model involved in the case was built by Yoder especially for General. It is clear that General relied heavily upon the expertise of Yoder's engineers in providing the proper machine for the job orders General had to perform. The machine cost $8,375.00.

When the new metal slitter arrived at General, it was not functioning properly. To understand the nature of the problem, it is necessary to explain briefly how this machine works. As indicated by its name, the basic function of a metal slitter is to cut sheet metal into strips of varying widths according to customers' orders. The operator accomplishes this by feeding sheet metal from a roll which rests on an arbor through rotary cutters which slit the metal into desired widths. As the strips of metal exit from the cutters, they are wound up onto take-up reels. To prevent the slitted metal from becoming entangled or wound around the cutter shaft, the operator inserts small pieces of wood called "stripper fingers" into the open spaces between the rotary blades after he positions the blades for the particular width desired. The uncoiler, which holds the metal sheets on an arbor, sits about 18 feet from the entrance to the cutters. Since there is no table between the uncoiler and these rotary blades, the machine has guides located about nine inches from the cutters in order to help feed the metal.

Soon after the machine arrived, employees who operated it complained to Mr. Tanseer, General's president and treasurer, that the metal tended to buckle up near the entrance to the cutter and would not stay within the guides. Mr. Tanseer complained to Yoder, and the manufacturer sent an engineer to examine the machine. The engineer's subsequent report contained a notation that the guides were inadequate, and Yoder recommended installation of a hold-down bar to prevent the metal from buckling up or rising over the entry guides. General agreed to purchase the bar and it was immediately installed on the Yoder machine.

Aside from the hold-down bar supplied by Yoder, two additional modifications were made by the plaintiff himself on the machine. First, he fashioned a pair of auxiliary guides, but these did not solve the problem of the metal riding out of the original guides. Secondly, when the original stripper fingers which were made from hard maple wood became worn out from continued use, plaintiff replaced them with duplicates fashioned from scraps of soft pine. Although the

duplicates were made from cracked wood, nevertheless they served the purpose for which they were intended, i. e. stripping the metal away from the cutter shaft. Yoder's instructions authorized the making of duplicate stripper fingers but did not specify that they be made of hard maple. Plaintiff's expert testified that even if the duplicates were fashioned from maple, the stripper fingers still might have fractured and allowed plaintiff's hand to enter the cutter area. In any event, nothing in the Yoder instruction booklet indicated that the stripper fingers served a safety purpose.

When the accident occurred, plaintiff was not using the hold-down bar mentioned above because it scratched the metal, bounced around and sometimes struck his elbow. However, since the soft copper he was slitting was buckled because of annealing, it became necessary for plaintiff to put his right hand on the metal (applying downward pressure) in order to keep the metal from riding over the guides. Downward pressure with his hand was the only method of solving the problem since any other material would scratch the surface or collect dirt. Because of plaintiff's 20 year accident-free experience in bearing down on metal with his hand he considered it safe to do so on the day of the accident. On this particular occasion, his right hand was four inches from the edge of the roll and nine inches from the cutters.

As the sheet moved into the machine, a sliver of metal that extended outward from the roll caught the soft part of the palm of his hand and pulled it into the stripper fingers. The force of his hand striking the stripper fingers caused them to be sucked through the rollers and into the cutters along with plaintiff's right hand and arm causing severe injuries.

At the time of the accident, the machine had no guard whatsoever in front of the cutters. The point at which the rotary blades are located on this machine creates an "in-running nip point." That term is applied to the point of contact between a fixed piece of equipment and rotating part where the tendency is for the material to be sucked or pulled into the machinery. The Yoder machine had other in-running nip points which had guards as standard equipment to prevent injury to persons who might come in contact with these mechanisms.

After plaintiff's hand and arm entered the machine, he immediately turned it off with his left hand. But as plaintiff describes it, his arm was already a piece of "bloody meat." Miraculously, a surgeon sewed the arm back on, even though a mere slice of skin held the extremity in place. Needless to say, plaintiff has suffered greatly over the past five years with numerous operations and out patient treatments. In addition, he has difficulty performing trivial acts such as tying his shoes or shaving. He will not work again.

If plaintiff's verdict withstands attack on any one of the three theories he advances, then any errors committed with regard to the other two become harmless. Rather than attempting to answer sixty objections seriatim (many of which would prove unnecessary or repetitive, we will consider plaintiff's case under Section 402A and examine in depth defendant's objections to it.

## II. MOTION FOR JUDGMENT N. O. V.

### A. STRICT LIABILITY UNDER SECTION 402A

#### (1) *OBVIOUSNESS OF THE DANGER.*

Pennsylvania law recognizes that a manufacturer may be liable under Section 402A for a design which creates an unreasonable risk of danger to the user.[2]

2. See generally P. Keeton, Manufacturer's Liability: The Meaning of "Defect" in Manufacture and Design of Products, 20 Syracuse L.Rev. 559 (1969); D. Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, 71 Yale 816 (1962); J. Wade, Strict Liability of Manufacturers, 19 Sw.L.J. 5 (1965);

See Bartkewich v. Billinger, 432 Pa. 351, 247 A.2d 603 (1968); Elder v. Crawley Book Machinery Co., 441 F.2d 771 (3rd Cir. 1971). Since liability is imposed even though the product is manufactured exactly as intended, the bad design itself constitutes the defect. But the design is considered defective only if it (the design) makes the product unreasonably dangerous.[3] Hence the focal issue in this case becomes whether or not the absence of a guard or other device on Yoder's metal slitter to prevent the operator from coming in contact with the rotary blades created an *unreasonable danger* to the operator.

Section 402A of the Restatement, 2d, Comment (i) states that a product is unreasonably dangerous if:

"The article sold [is] *dangerous to an extent beyond which would be contemplated by the* ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." (emphasis supplied).

Similarly comment (g) explains that a defective condition exists:

"[W]here the product is, at the time it leaves the seller's hands in a condition *not contemplated by the ultimate consumer* which will be unreasonably dangerous to him." (emphasis supplied).

Again, as to when warnings of the manufacturer are necessary, comment (j) states, in part:

"But a seller is not required to warn with respect to products * * * when the danger or the *potentiality of danger, is generally known."* (emphasis supplied).

Defendant summarizes the import of these comments as follows:

"In short, as the Restatement intended, an *obvious danger*, known to the average person as such, is not an 'unreasonable danger' and hence there is no liability on the manufacturer if one encounters it." [4]

Moreover, defendant asserts that Pennsylvania Supreme Court's decision in Bartkewich v. Billinger supra, supports the contention that:

"If the absence of a safety guard presents an obvious danger, (the manufacturer) is not liable to a person who tests the danger."[5]

To complete the syllogism, defendant then concludes that the Yoder machine was not unreasonably dangerous because the danger created by unguarded blades is patently obvious, especially as to an experienced operator such as the plaintiff. As persuasive as this argument seems, it contains one fatal flaw.

In essence, the defendant advocates the so-called "latent defect" rule, i. e., the injured party must have been unaware of the defect in order to recover. According to this view, the danger must be hidden and consequently not reasonably contemplated by the average user.[6]

In the *Bartkewich* decision, the Pennsylvania Supreme Court specifically mentioned that a case it relied upon was decided under New York's "latent defect rule", as set forth in Campo v. Scofield, 301 N.Y. 468, 95 N.E.2d 802 (1950). In *Campo*, the New York Court of Appeals denied recovery to a worker whose hands accidentally became caught in machine rollers while he was performing his usual tasks. Plaintiff claimed that it

---

D. Noel, Recent Trends in Manufacturers' Negligence as to Design, Instructions or Warnings, 19 Sw.L.J. 43 (1965); I Frumer & Friedman, Products Liability §§ 5 to 15 (1968).

3. See J. Wade, Strict Liability of Manufacturers, supra, note 2 at 14-15 (1965).

4. Defendant's Brief in Support of Post Trial Motion for Judgment n. o. v. and New Trial at 10-11.

5. Id.

6. See I Frumer and Friedman, supra note 2 at §§ 6.04, 7.02 and 8.04; Comment, Foreseeability in Product Design and Duty to Warn Cases—Distinctions and Misconceptions, 1968 Wis.L.Rev. 228.

was unsafe for the machine to have neither a guard nor an emergency switch, but the court allowed a directed verdict for defendant to stand because there was no evidence that plaintiff was unaware of the danger. Recognizing that reliance upon the New York case might cause confusion, the Pennsylvania Supreme Court expressly cautioned:

> "We in *no way* mean to imply * * * that we are adopting the 'latent defect' test or approving of the decision in *Campo.*" (emphasis added). Id., 432 Pa. at 356 n. 3, 247 A.2d at 606.

This skepticism of the latent defect rule places Pennsylvania in keeping with the modern trend which recognizes that manufacturers ought to make safer not more dangerous products.

For example, in Palmer v. Massey-Ferguson, Inc., 3 Wash.App. 508, 476 P. 2d 713 (1970) the Washington Supreme Court held that the trial court properly refused defendant's requested instruction that a manufacturer has no duty to provide guards to prevent injury from a patent peril or source manifestly dangerous:

> "The rule excusing the duty of safe design because of a patent peril has come under criticism in treatises. See Frumer & Friedman, Products Liability § 7.02 (1968). It seems to us that a rule which excludes the manufacturer from liability if the defect in the design of his product is patent but applies the duty if such a defect is latent is somewhat anomalous. The manufacturer of the obviously defective product ought not to escape because the product was obviously a bad one. The law, we think, ought to discourage misdesign rather than encouraging it in its obvious form." *Id.* at 718–719.

And in Pike v. F. G. Hough Co., 2 Cal.3d 465, 85 Cal.Rptr. 629, 467 P.2d 229 (Calif.1970),[7] the California Supreme Court also rejected the proposition that an obvious defect in a product precludes recovery:

> "Even if the obviousness of the peril is conceded, the modern approach does not preclude liability solely because the danger is obvious. * * * [It is reasonable] to require reasonable care to protect even the buyer himself from what may be foreseen as an unreasonable danger to him. * * * Harper & James, The Law of Torts, * * * § 28.5." Id. at 636, 467 P.2d at 235.

The *Bartkewich* case and the progressive attitude of the Pennsylvania Supreme Court since adoption of Section 402A in Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966)[8] is clear evidence that the Court would adopt a rule similar to that expressed in the *Palmer* and *Pike* decisions. Therefore, we hold that even though the *danger of unguarded rotary blades* was obvious to plaintiff, this does not *ipso facto* preclude recovery.

It does not follow from this holding that the manufacturer of every obviously defective or dangerous product owes an automatic duty to an injured party. Although a knife qualifies as an obviously dangerous instrumentality, a manufacturer need not guard against the danger that it presents. "[Nor is it] necessary to tell a zookeeper to keep his head out of the hippopotamus' mouth." Bartkewich v. Billinger, supra at 356, 247 A.2d at 606. See also 2 Harper and James, The Law of Torts, § 28.6 (1956 ed). The point is that to preclude absurd results the obviousness of the danger must constitute but *one* of the factors that determines whether the danger is unreasonable.

The proper test of "unreasonable danger" is whether a reasonable manufacturer would continue to market his product in the same condition as he sold it to the plaintiff *with* knowledge of the potential dangerous consequences the

---

7. See Comment, Strict Liability in Tort Based on Defective Design, Pike v. Frank G. Hough Co., 1970 Wash.U.L.Q. 359.

8. See generally, Comment, Products Liability in Pennsylvania, 13 Villa.L.Rev. 793 (1968).

trial just revealed.[9] See P. Keeton, Manufacturer's Liability: The Meaning of "Defect" in the Manufacture and Design of Products, supra note 2 at 568. See also Pike v. F. G. Hough Co., supra.

To answer this question one must:

"[balance the] likelihood of harm to be expected from a machine with a given design and the gravity of harm if it happens against the burden of precaution which would be effective to avoid harm." 2 Harper and James, The Law of Torts § 28.4 (1956 ed), cited with approval in Pike v. F. G. Hough Co., supra.

And in measuring the likelihood of harm one may consider the obviousness of the defect since it is reasonable to assume that the user of an obviously defective product will exercise special care in its operation, and consequently the *likelihood* of harm diminishes.

In a persuasive article, Dean Wade has enumerated the specific factors that enter into the final balance as follows:

"(1) the usefulness and desirability of the product, (2) the availability of other and safer products to meet the same need, (3) the likelihood of injury and its probable seriousness, (4) the obviousness of the danger, (5) common knowledge and normal public expectation of the danger (particularly for established products), (6) the avoidability of injury by care in use of the product (including the effect of instructions or warnings), and (7) the

ability to eliminate the danger without seriously impairing the usefulness of the product or making it unduly expensive." [10]

Taking the Harper and James formulation as expanded by Dean Wade, it becomes understandable why the plaintiff accidentally injured by a knife does not recover from the manufacturer. The product is not *unreasonably* dangerous and no duty arises because (1) everyone realizes the dangers; (2) by definition a guard over the blade (the part that causes danger) would eliminate its utility; (3) the cost of a "safe" knife might be prohibitive. Balancing the likelihood and gravity of harm against the burden of protection, a manufacturer should not be liable for a slip of the knife.

But consider the Yoder machine. Certainly Dorsey knew the danger of unguarded cutters. On the other hand, a guard would not eliminate the machine's usefulness, nor would the cost of $200 to $500 on an $8,000 machine be unreasonable. Moreover, the seriousness of the potential harm was great. Ultimately, all of these facts were questions to be weighed by the jury in making their ultimate determination as to whether, under all of the circumstances, the machine was "defective". The jury found the balance tipped in favor of plaintiff. Considering the evidence in this case, this court could not possibly rule otherwise.

9. The charge on this point reads as follows:
"Now, in this particular case the claim is that the Yoder Company was negligent when they manufactured this machine, in that they failed to include in it certain safety devices, which it is alleged if they had been included would have prevented this accident.
There is a threshold factual question which is central to all three theories of liability that you have got to decide.
Was it reasonable for The Yoder Company not to have installed a hand guard when they originally designed and sold this machine? Should they not have anticipated, reasonably anticipated, that

there would be situations in the production line where a worker's hand might get snagged in this roll of metal that is being fed into the machine at the rate of 150 feet per minute? Should they not have anticipated that this might happen?
Ought they not to have realized that if that happened the man's hand would be into the cutter in less that one-tenth of a second? Was their failure to anticipate that and incorporate in the machine a design to prevent the occurrence of this type of injury the failure to use reasonable care under the circumstances." (N. T. at 1047–48).

10. J. Wade, Strict Liability of Manufacturers, supra note 2 at 17.

### (2) Abnormal Use

Defendant advances the abnormal use of the machine as an additional reason for concluding as a matter of law that the metal slitter was not unreasonably dangerous to the plaintiff. According to the Restatement of Torts, 2d, a manufacturer assumes no responsibility for injuries that occur during an unforeseeable use or manner of use.[11] Comment h to Section 402A explains:

"A product is not in a defective condition when it is safe for normal handling and consumption."

And Comment j to Section 395 explains the rationale behind this rule:

"The liability stated in this Section is limited to persons who are endangered and the risks which are created in the course of uses of the chattel which the manufacturer should reasonably anticipate. In the absence of special reason to expect otherwise, the maker is entitled to assume that his product will be put to a normal use, for which the product is intended or appropriate; and he is not subject to liability when it is safe for all such uses, and harm results only because it is mishandled in a way which he has no reason to expect, or is used in some unusual and unforeseeable manner."

Thus, in Adams v. Scheib, 408 Pa. 452, 184 A.2d 700 (1962), the Pennsylvania Supreme Court held that a seller of pork was not obliged to foresee that a customer would fail to cook the meat adequately. On the other hand, in La-Gorga v. Kroger Company, 275 F.Supp. 373 (W.D.Pa.1967), aff'd 407 F.2d 671 (3rd Cir. 1969), the District Court stated that a manufacturer should have foreseen the possibility that a child's jacket might catch fire.[12]

In this case, Yoder contends that it could not reasonably foresee use of the machine either without a guard or manually, because it reasonably expected both (1) that General would install a guard over the cutter and (2) that the machine would be operated automatically without the operator ever using his hands to hold down the metal.

Since defendant argued these points to the jury [13] and the charge directed the jury to consider them,[14] the question now posed is whether the manner in which Dorsey operated this machine so unforeseeable that as a matter of law Yoder's product was not unreasonably dangerous.

To support the proposition that it expected General to install a guard, Yoder relies heavily upon a Third Circuit case, Smith v. Hobart Manufacturing Company, 302 F.2d 570 (3rd Cir. 1962). In Smith, plaintiff was seriously injured when his hand became entangled in an electric meat grinder as a result of his slipping on a platform while operating the machine. There, however, the manufacturer had supplied plaintiff's employer with a properly guarded meat grinder, but it was removed by the employer in direct violation of a Pennsylvania statute forbidding such conduct. Plaintiff's theory rested on Section 302 (b) of the Restatement which renders an actor negligent if his act or omission

11. See generally Comment, Foreseeability In Product Design and Duty to Warn Cases, Distinctions and Misconceptions, supra note 7; 1 Frumer and Friedman, Products Liability, § 15 (1968); Prosser, The Fall of the Citadel, 50 Minn.L.Rev. 791 (1966); D. Noel, Manufacturer's Negligence of Design or Directions for Use of a Product, supra note 2.

12. Some other examples applying Pennsylvania law are: Speyer, Inc. v. Humble Oil & Refining Company, 275 F.Supp. 861 (W.D.Pa.1967) (no obligation to foresee cab driver pulling away from a gas pump without removing the hose from the filler pipe); Dyson v. General Motors Corp., 298 F.Supp. 1064 (E.D.Pa.1969) (foreseeable that in an accident an automobile might roll over and rest on its roof); Greco v. Bucciconi Engineering Co., 407 F.2d 87 (3rd Cir. 1969) (foreseeable that a steelworker would reach under the fingers of a sheet metal piler).

13. See N.T. 985–1005.

14. See Note 9, supra and charge on page 442 infra.

creates an unreasonable risk of harm through the "expectable action" of a third person. The court held that there was insufficient evidence for a jury to conclude that Hobart could reasonably have foreseen or expected plaintiff's employer to remove the guard it had installed on the machine in direct violation of the statute.

By twisted logic, Yoder seeks to reverse the reasoning of *Smith* and say that General's failure to *add* a safety device which Yoder failed to supply was not reasonably foreseeable, and that as a result, operation of the slitter without a guard constituted use in an abnormal manner.

To support the reasonableness of its expectation, Yoder relies upon Section 2(d) of the Pennsylvania General Safety Act.

Subsection (d) reads as follows:

"(d) The point of operation on all saws, planers, jointers or other power driven woodworking machines and all power presses, planers, shapers, and other power driven machine tools, and dangerous parts of any other machines or devices shall be provided with guards of a type approved by the department. Laundry machines, extractors, washers, ironers, and other machines or apparatus shall be provided with guards where, because of accident hazard, they are required by the department." 43 P.S. § 25–2.

But unlike the plaintiff's employer in *Smith,* this statute imposed no duty upon General to install guards.

In Matulonis v. Reading Railroad Co., 421 Pa. 230, 219 A.2d 301 (1966), the Pennsylvania Supreme Court held that the Act is "not self-executing" and in order to establish its application it was necessary for plaintiff "to establish that the Department of Labor and Industry had established and promulgated such rules and regulations and that the statute [had been violated] by failing to comply with said rules and regulations." *Id.* at 232–233, 219 A.2d at 303. Neither Yoder nor this court has been able to find any regulations issued by the Department of Labor and Industry covering metal slitters. Consequently Yoder cannot rely upon this law as a foundation for its expectation that General would install guards.

Aside from the statute, none of the evidence indicates that Yoder had any reason whatsoever to expect that General would install any guards. Mr. Tanseer, the president and treasurer of General testified that he had no engineering background, knew nothing about the operation of the slitter and consequently relied exclusively upon Yoder to supply him with the proper machine. Moreover, Yoder never discussed safety features with General nor did its representative indicate to Mr. Tanseer that the machine required a safety device over the cutters. In sum, the jury's implicit conclusion that Yoder had no reason to expect General to install the guards meshes perfectly with the weight of the evidence.

Yoder also asserts that it could not reasonably foresee the possibility that plaintiff would place his hand on or over the metal just 9″ inches from the cutters. Defendant points out that the slitter was designed to operate *automatically* and the instruction booklet so indicated. Manual feeding, so its argument goes, constituted an abnormal manner of operation. Yoder asserts that Bartkewich v. Billinger, supra, requires this court to agree with the assertion as a matter of law. We are convinced, however, that the issue was properly left to the jury, and *Bartkewich* does not require otherwise.

*Bartkewich* has caused other courts to disagree as to precisely what it stands for.[15] The facts are relatively simple. Plaintiff, an experienced glass factory worker, severely injured his hand when he reached into a glass crushing machine while it was running to break up a glass

---

15. See Judge Fullam's Opinion in Dyson v. General Motors Corp., 298 F.Supp. 1064, 1071 (E.D.Pa.1969).

jam. He sued the manufacturer alleging that both the lack of a guard which would have prevented the operator from inserting his hand into the machine and the absence of an on-off switch on the side of the machine where he was working created an unreasonable danger.

The Supreme Court reversed a verdict for the plaintiff and apparently held that the machine was not defective because voluntarily *placing one's hand into the machine* constituted an abnormal use.[16]

Unlike the plaintiff in *Bartkewich*, Dorsey did not place his hand *into* the machine, rather he placed it over the metal 9″ from the cutters. A jury could reasonably find that Yoder should have expected that an operator on occasion might have to use his hand in such a manner. See Greco v. Bucciconi Engineering Co., 407 F.2d 87 (3rd Cir. 1969).

Yoder is a large manufacturer of metal slitters doing business throughout the country. As such, it is held to the standards of an expert.[17]

Uncontroverted testimony of the plaintiff established that some rolls of sheet metal are defective and this cannot be ascertained until the slitting process begins; the Yoder machine did not feed properly when this occurred; an operator would nevertheless continue to cut the metal because the defect did not normally affect the salability of the final product; and, as a result, an operator has to use his hand to feed the metal properly into the blades. This evidence indicates that manual operation constituted a not unusual or abnormal means of operation and Yoder should have known about it.

Moreover, the jury could reasonably conclude that Yoder should have known about the inadequacy of the hold-down bar which it hoped would correct the problem. Plaintiff testified that it bounced up and down occasionally striking his elbow, and scratched the metal because it was unpolished. The jury could reasonably conclude from this evidence that Yoder should have realized the uselessness of the device.

### (3) *Substantial Change*

Another element of strict liability requires that:

"[the product] is expected to and does reach the user or consumer without

---

16. "There is no question, of course that the lack of proper safety devices can constitute a defective design for which there may be recovery under § 402A (citation omitted). We believe, however, that this rule should only apply to allow recovery where the absence of a safety device caused an accidental injury which was of the type that could be *expected from the normal use of the product.*"

 \* \* \* \* \*

"Appellant was entitled to believe that the machine would be used in its *usual manner*, and need not be an insurer for the extraordinary risks an operator might choose to take." (emphasis added) 432 Pa. at 354 and 356, 247 A.2d at 605 and 606. At another point in the opinion the court observed:

"We do not believe that appellant (the defendant) was required to install a guard rail which would prevent a person from *voluntarily putting himself at so obvious* a risk." (emphasis added). Id.

In a recent opinion, Elder v. Crawley Book Machinery Co., supra, the Third Circuit indicated that:

"While Bartkewich v. Billinger has been cited as being concerned with assumption of risk, careful reading will show that the opinion holds, not that the plaintiff was guilty of assumption of risk by placing his hand in a machine, but that there was a failure to prove that the machine itself was in a defective condition because of lack of a guard which would have prevented the plaintiff from voluntarily placing his person in danger of injury. The case therefore stands for the proposition that the plaintiff failed to prove that the machine was dangerously defective, not that the defendant proved assumption of risk on the part of the plaintiff." *Id.*, 441 F.2d at 773 n. 2 (dictum). Contra, Greco v. Bucciconi Engineering Co., 407 F.2d 87, 92 (3rd Cir. 1969).

17. See 1 Frumer and Friedman, Products Liability § 7.01 (1968).

*substantial change* in the condition in which it was sold". Restatement of Torts, 2d § 402A. (emphasis added). Defendant asserts that it expected the machine to undergo substantial change because General was to install guards over the cutters. Whether or not the addition of a guard constitutes a "substantial change," this contention lacks merit since Yoder's expectation of the addition by General was unreasonable. See Section IIA(2).

■ Yoder cites the substituted stripper fingers made of soft pine rather than hard maple as another "substantial change. Comment (p) to Section 402A explains that a substantial · change involves situations where the product itself will undergo processing or substantial modification such that the product originally sold is not *itself* in a final or remotely usable state *viz.* the ultimate consumer. Thus, the comment presents the following example:

> "[T]he manufacturer of pigiron, which is capable of a wide variety of uses, is not so likely to be held to strict liability when it turns out to be unsuitable for the child's tricycle into which it is finally made by a remote buyer."

In this case, the mere use of soft pine rather than hard maple in making substitute stripper fingers did not constitute a substantial change. The new fingers served the same function as the old ones, i. e., to keep the cut metal from becoming tangled in the cutter shaft. The machine still operated in the same way and performed the same function. Moreover, the stripper fingers were not designed to operate as a guard. In short, the jury could reasonably conclude that the change was insubstantial.

## B. CAUSATION

■ Defendant's other basis for judgment n. o. v. against the plaintiff asserts that "the knowledge of the plaintiff and General of the alleged defect and its obvious danger would make the negligent acts of General (in failing to install a guard), and plaintiff in operating the machine 'intervening superseding' causes relieving defendant from any liability." [18] This contention has no merit.

First, as to General, the jury found that company free from any negligence; [19] therefore no negligent act on their part exists to intervene. And as to Dorsey, even assuming he acted negligently, such an act or omission will relieve Yoder only if it:

> " * * * was so extraordinary as not to have been reasonably foreseeable, and * * * whether the act was reasonably foreseeable [is] to be determined by following retrospectively the sequence of events and looking back from the harm to the negligent act rather than by considering whether the defendant should prospectively have envisaged the events which unfolded and caused the accident." Wilson v. American Chain and Cable Co., 364 F.2d 558, 562 (3rd Cir. 1966). See also Shimer v. Bangor Gas Co., 410 Pa. 92, 97, 188 A.2d 734 (1963).

There is nothing in the record that indicates to us that as a matter of law Dorsey's act of using an unguarded machine was so unforeseeable that it possibly constituted an "intervening superseding cause." [20] Further, even if the test were a prospective one, there was abundant evidence for the jury to conclude that Yoder should have anticipated that occasional feeding problems might cause the operator to put his hand on the metal and that if the metal caught his hand, the stripper fingers would not act as an adequate guard.

18. Defendant's Brief In Support of Post Trial Motions for Judgment n. o. v. and New Trial at 13.

19. For this reason and the fact that the Pennsylvania General Safety Act imposes no duty upon the employer to install a guard, we must deny Yoder's motion for judgment n. o. v. against General. See Section IIA(2) supra.

20. Hence it was not error to fail to charge the jury on intervening superseding cause.

## II. MOTION FOR A NEW TRIAL

### A. ASSUMPTION OF THE RISK

 Although a duty arose between Dorsey and Yoder, nevertheless, under Pennsylvania law, the defendant is relieved of liability if plaintiff voluntarily assumed the risk.[21] See Ferraro v. Ford Motor Co., 423 Pa. 324, 223 A.2d 746 (1966). On that issue the jury was charged as follows:

"Assumption of risk is walking into a dangerous situation with your eyes open, not inadvertently and testing a known danger.

For example, in my view—and this of of course is not binding on you—but in this case, if Mr. Dorsey had consciously put his hand into the machine, you might find that he assumed the risk.

But if you believe the testimony here that he put his hand on the copper simply to feed it into the machine and then it was picked up by a splinter and taken into the machine, I do not believe that you could find him guilty of assumption of risk, because there is no evidence that he had consciously assumed the risk of injury." (N.T. 1055).

Defendant excepts to this charge because:

"The distinction is not one of putting a hand into a machine as described by the trial judge, but knowing the danger (or "defect") and voluntarily doing an act which exposed him to the danger, i. e., putting his hand in proximity to the danger * * * The mere fact that the judge charged the jury on assumption of the risk is unimportant in light of his further in-struction that on the evidence in this case he did not believe the defense existed. This was prejudicial, fundamental error."

As to the law on assumption of the risk, defendant ignores one vital aspect. In addition to realizing the existence of the defect or danger and voluntarily doing an act which exposes himself to it; the plaintiff must *perceive and appreciate the risk* involved,[22] i. e., the *probability* of harm. In other words, although Dorsey knew about the *existence* of a danger and although he voluntarily (i. e., without inadvertence) put his hand *on the metal;*[23] under the circumstances, he may not have appreciated the *risk* of his actions.

Section 496D of the Restatement, 2d, states this often overlooked contour of assumption of the risk:

"§ 496D. *Knowledge and Application of Risk.*

Except where he expressly so agrees, a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character."

Moreover, as Comment (c) explains, the question is not whether he *should have realized* the risk that putting his hand on the metal created, but *whether in fact,* plaintiff *did realize* the risk involved.

"The standard to be applied is a subjective one, of what the particular plaintiff in fact sees, knows, understands and appreciates. In this it differs from the objective standard which is applied to contributory negligence. (See §§ 464, 289 and 290). If by reason of age, or lack of informa-

---

21. See generally R. Keeton, Assumption of Product Risks, 19 Sw.L.J. 61 (1965); R. Keeton, Assumption of Risk in Products Liability Cases, 22 La.L.Rev. 122 (1961); G. Epstein, Products Liability Defense Based on Plaintiff's Conduct, 1968 Utah L.Rev. 267 (1968); 1 Frumer and Friedman, Products Liability § 8.06 (1968); Prosser on Torts, § 67 (1964 ed.).

22. See Prosser on Torts, § 67 (1964 ed.); Comment, Tort Defenses to Strict Products Liability, 20 Syracuse L.Rev. 924 (1969).

23. Compare Elder v. Crawley Books Machinery Co., supra.

tion, experience, intelligence, or judgment, the plaintiff does not understand the risk involved in a known situation, he will not be taken to assume the risk, although it may still be found that his conduct is contributory negligence because it does not conform to the community standard of the reasonable man." [24]

In Hennigan v. Atlantic Refining Co., 282 F.Supp. 667 (E.D.Pa.1967), the court had occasion to apply such a standard. There, several workmen were killed when oil seeped into a sewer tunnel they were constructing and exploded. Defendants asserted that since the testimony indicated that the decedents smelled gas and became lightheaded, they had assumed the risk. Although the workmen voluntarily placed themselves in the tunnel, and it is elementary that gas explodes, nevertheless, Judge Higginbotham permitted recovery because:

"There was no evidence that they knew or should have known (a) that the vapors were at or near the explosive limits; (b) that a random spark from any source could cause a flash fire and explosion, and (c) that the equipment being used was likely to create a spark.

The evidence is only that the odor of petroleum permeated the area. But, there was not one shred of evidence that this odor or the training or experience of the decedents was such that they " * * * appreciate[d] the danger itself and the nature, character and extent which made it unreasonable * * *." Restatements 2d, Torts, § 496(D), Comment (b) (1965); Falyk [v. Penna. R. R. Co.], supra, [256 Pa. 397] at 401, 100 A. 961, 965; Madden v. Lehigh Valley R. R. Co., 236 Pa. 104, 109, 84 A. 672 (1912);

Valjago v. Carnegie Steel Co., 226 Pa. 514, 519–520, 75 A. 728 (1910). See also Restatement 2d, Torts, § 496(D). Comment (c) and § 496(c), illustration 7 to comment (i)." Id. at 682.

The Hennigan case should be compared with Green v. Sanitary Scale Company, 431 F.2d 371 (3rd Cir. 1970). In the latter case, the plaintiff seriously injured his hand when it became caught in a meat grinder. Although the machine came equipped with an aluminum stomper, plaintiff would use his hand to push meat down into the funnel-shaped hopper until it was caught by the worm gear (about four inches below the top of the hopper). Then he would withdraw his hand and use the metal stomper. On the occasion in question, he forced a chunk of meat into the hopper by hand, but after feeling the meat catch, he could not withdraw his hand.

The District Court refused to charge on assumption of the risk, but the Court of Appeals reversed stating:

"Green testified that he was familiar with the mechanism of the meat grinder, *realized that his hand would be caught if he inserted it too far into the hopper,* and was uncertain just how far he had reached into the hopper before he found himself unable to remove his hand. From such testimony the jury could reasonably have inferred that Green *knew a risk of danger existed* in using his hand instead of the aluminum stomper to press meat down into the hopper, and that he voluntarily assumed this risk because, as he testified, it was more convenient to use his hand with the large chunks of meat." Id. at 374. (emphasis added).

Thus, unlike the Hennigan case, the plaintiff in Green admitted that he perceived the risk.[25]

24. See P. Keeton, Products Liability—Problems Pertaining to Proof of Negligence, 19 Sw.L.J. 26 (1965). For lucid analysis of this important distinction, see Halepeska v. Callihan Interests, Inc., 371 Sw.2d 368 (Texas 1963).

25. In Bartkewich, the Pennsylvania Supreme Court indicated that the plaintiff *must have perceived the risk* of placing his hand *into* a glass grinding machine. No reasonable man could believe otherwise. See Restatement, Torts, 2d § 496D, Comment d. Compare Elder v. Crawley Book Machinery Co., supra.

In this case, plaintiff testified as follows:

"Q. Let me ask you this. In all your history as a slitting machine operator how many times have you encountered slivers like this in metal?

A. I never ran into one inside before.

Q. This is the first time you had ever run into it?

A. Yes, sir.

Q. Wouldn't you consider that a defective piece of material?

A. Well, I don't know—after sight, yes.

Q. What was that?

A. On after sight, yes, but up until then—

Q. You had never seen it in all of the years or of your experience?

A. I never saw one, not in the inside of the material.

Q. Right. And you were four inches from the edge?

A. Yes.

Q. Approximately four inches?

A. Approximately four inches, yes. It would be four to six inches, counting the whole hand?

Q. This splinter, Mr. Dorsey, I take it you are describing it as being—the point of it as being toward the machine as the material is coming out?

A. Yes.

Q. Is that correct?

A. Yes, sir.

Q. And when you put your hand down —by the way, were you wearing gloves?

A. It happened so fast that I just couldn't go into a detailed account of it.

Q. Well, were you wearing gloves?

A. No, sir. I never wore gloves around a machine because it would get caught in the machinery.

A. All right.

Now, as I understand it when you put your hand down to hold this thing in the guides, the material was slipping under your hand for a while?

A. Yes, sir.

Q. And then the sliver came along?

A. Yes, sir.

Q. And is that what it took your hand into?

A. Took my hand into the bevel.

Q. The sliver?

A. The sliver and the metal.

Q. If it had not been for that sliver you would have been able to do as you had at least once a month before?

A. That's right.

Q. Hold your hand there safely without getting it into the cutting disk?

A. Yes, sir.

Q. Isn't that right?

A. That's right."

Considering this testimony it is quite likely that, in light of twenty years' prior experience, Dorsey did *not in fact* appreciate the *risk* of his actions. It cannot be said as a matter of law that the jury could reach such a conclusion.

Defendant relies heavily upon dictum in Elder v. Crawley Machinery Co., supra, to support his incomplete statement of the law. In that case, the Third Circuit stated:

"Sanctioning a defense against the claim of a person who knows of the defect but chooses to use the product nevertheless [does not frustrate the purpose of Section 402A]. It is fair to state in such a situation that the manufacturer's obligation to furnish a safe product has been waived by the consumer's considered choice to chance the danger involved in the defect." 441 F.2d at 774.

But even this dictum does not advance defendant's contention because (to fit this case within the language) one cannot accurately state that Dorsey made "a *considered choice to chance the danger involved*," because he did not perceive the *risk* that his action created.

## B. FORESEEABILITY OF USE (ABNORMAL USE)

■ Defendant complains that the court failed to instruct the jury properly that Yoder would not be liable if it could not foresee the need for manual use of this machine due to defective metal. But defendant argued these points to the jury[26] and the jury was charged as follows:

"It has been argued to you here that there is some evidence of improper use, both in connection with putting his hand on the copper, number one, and, number two, the allegedly defective copper.

Well, you consider that evidence and determine in your own minds whether it was not foreseeable to The Yoder Company that, number one, occasionally these machines would get snagged or jammed, whether from bad metal or from any other cause, and, two, occasionally an operator would put his hand on that metal.

If you find that that is a reasonable thing for them to anticipate as designers and manufacturers of this machine, then they are bound to anticipate, bound to anticipate, that sometimes you are going to run into bad metal and that sometimes the operator might thereby or therefore, I suppose, put his hand on the metal as it is being fed into the machine."
(N.T. 1056–57).

The fact that the actor could not foresee the particular manner in which the harm has occurred is immaterial. See Diakolios v. Sears, Roebuck & Co., 387 Pa. 184, 127 A.2d 603 (1956); Vereb v. Markowitz, 379 Pa. 344, 108 A.2d 774 (1954); Restatement, Torts, 2d § 435 (i). Dyson v. General Motors, supra. We find no error in this charge.

## C. GENERAL SAFETY LAW OF PENNSYLVANIA

Defendant excepts to the charge concerning the relevance of the General Safety Law of Pennsylvania to the manufacturer's (Yoder's) negligence. See Part IIA(2), supra. In discussing this provision, the jury was instructed as follows:

"This statute can be considered by you as a statement of public policy of the Commonwealth with respect to what the legislature felt was a reasonable standard, and you may consider this in determining your own judgment as to what is a standard of reasonable care in connection with the design and manufacture of [a] machine and in connection with the utilization of [it] in [a] plant." (N.T. 1063).

■ While the focus of this statute might be upon the owner, the Pennsylvania Supreme Court in Matulonis v. Reading Railroad Co., supra, held that the statute itself without Department regulations creates no per se duty upon anyone. Nevertheless, since it expresses a legislative policy, it still can be used as a factor relating to the issue of the unsafe nature of a manufacturer's design. Cf. Green v. Sanitary Scale Co., 296 F. Supp. 625 (E.D.Pa.1969); rev'd on other grounds, 431 F.2d 371 (3rd Cir. 1970) (en banc). But Cf. Walsh v. Miehle Goss-Dexter, Inc., 378 F.2d 409, 413 (3rd Cir. 1967). The statute at least stands for the proposition that unguarded metal slitters are dangerous.

■ It is clear that codes of various reputable safety groups are admissible to show the danger of a particular design, even though these expressions of opinion have no binding or legal effect upon the parties.[27] Since Codes are admissible to

---

26. See N. T. 987–1005.

27. See Sage v. Northern Pac. R. W. Co., 62 Wash.2d 6, 380 P.2d 856 (1963) (Booklet issued by National Safety Council); McComish v. DeSoi, 42 N.J. 274, 200 A.2d 116 (1964) (Naval and Air Force Safety Manuals); Hercules Powder Co. v. DiSabatino, 188 A.2d 529 (Del.1963) (National Electric Safety Code); Wallner v. Kitchens of Sara Lee, Inc., 419 F.2d 1028 (7th Cir. 1969) (American Safety Standards Institute Code).

support expert testimony of a defect, it cannot be seriously argued that an expression of the Pennsylvania legislature to the same effect must be excluded.

O'Neill v. United States, 411 F.2d 139 (3rd Cir. 1969) did not hold otherwise. That case indicates (without any reference to the Pennsylvania Supreme Court's holding in *Matulonis*), that the owner of a defective machine *might* be negligent per se under the General Safety Act, and consequently the court remanded the case for such a determination.

### D. PLAINTIFF'S EXPERT TESTIMONY

 Defendant argues that Dr. Shore should not have been permitted to testify as an expert as a matter of law because of his total lack of knowledge concerning *metal slitting machines*. Although this expert lacked familiarity with these particular machines; nevertheless, as an engineer in industry, the armed forces, and at the University of Pennsylvania where he is professor and Chairman of the Graduate Division of Civil Engineering, he has designed and worked with many machines that operate under the same principles at the Yoder slitter. He certainly has "[a] reasonable pretention to specialized knowledge on the subject under investigation." Moodie v. Westinghouse Electric Corp., 367 Pa. 493, 501, 80 A.2d 734, 738 (1951). Dr. Shore was eminently qualified as an expert with regard to the hazards created by the design of the Yoder machine. See Griffith v. Clearfield Truck Rentals, Inc., 427 Pa. 30, 233 A.2d 896 (1967); Wallner v. Kitchens of Sara Lee, Inc., 419 F.2d 1028 (7th Cir. 1969); Farr v. Wheeler Mfg. Corp., 24 Mich.App. 379, 180 N.W.2d 311 (1970).

### E. ADDITIONAL ERRORS

We have considered all other alleged errors cited by counsel for the defendant and find them either without merit or harmless.[28]

---

28. See Fed.R.Civ.Proc. 61.