William W. FORD, III
v.
HARNISCHFEGER CORPORATION.
Civ. A. No. 71–1685.

United States District Court,
E. D. Pennsylvania.
Oct. 30, 1973.

Louis W. Fryman, Philadelphia, Pa., for plaintiff.

Barton L. Post, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT, DISCUSSION AND CONCLUSIONS OF LAW

GORBEY, District Judge.

This is an action for personal injuries arising out of an accident occurring on December 22, 1969, in which plaintiff was injured while working at the Edgcomb Steel Company, in Andalusia, Bucks County, Pennsylvania. Plaintiff claims that he was injured while riding on a forklift crane, manufactured by the defendant, and that his injuries were the result of the defective design, assembly, construction and/or manufacture of the machine, which was caused by the negligence and other wrongful conduct of the defendant. The case was tried on May 17, 18, and 21, 1973, before this court without a jury. The following are findings of fact and conclusions of law as required by the Federal Rules of Civil Procedure No. 52.

### FINDINGS OF FACT

1. Plaintiff, William W. Ford, III, is a citizen and resident of the Commonwealth of Pennsylvania, residing therein, at 6165 Erdrick Street, Philadelphia, Pennsylvania.

2. Plaintiff is now 30 years of age, and at the time of the accident, was 27 years old.

3. Plaintiff is married and is the father of three young children. He resides with his family at the Erdrick Street address.

4. At the time of the accident and for approximately three years prior thereto, plaintiff was employed as a general maintenance worker at the Edgcomb Steel Company, in Andalusia, Bucks County, Pennsylvania. Plaintiff's duties included execution of repairs and maintenance operations on cranes and other machinery at the Edgcomb plant.

5. Defendant Harnischfeger Corporation is a Wisconsin corporation and

maintains its principal place of business in Milwaukee, Wisconsin.

6. Defendant is engaged in the business of designing, manufacturing, fabricating, inspecting, testing and selling various types of industrial machinery, including the "P & H" brand of "power mast overhead cranes", a type of materials handling equipment for use in factories and warehouses.

7. Defendant Harnischfeger Corporation designed, constructed, assembled, manufactured, tested and inspected a certain machine, known as "P & H Stacker Crane", serial no. CHS–20718.

8. Sometime in 1965, defendant corporation sold the aforesaid crane to Edgcomb Steel Company, and delivered and installed the said crane to the premises at Edgcomb Steel Company, in Andalusia, Bucks County, Pennsylvania.

9. The crane in question had a rated lifting capacity of three tons and was capable of generating forces considerably in excess of three tons.

10. The crane hoist in question is controlled by a handcontrol, located in a steel cab, attached to the hoist.

11. The cab has two window-like openings.

12. The opening on the front, or fork side, of the cab was not guarded by windows or wire mesh enclosures at the time of the accident.

13. On December 22, 1969, plaintiff and one of his co-workers at Edgcomb, John J. Wright, were instructed by the maintenance supervisor, Alan Maahs, to ride-up the crane to the ceiling in order to tighten some bolts and nuts which required attention at the top of the crane.

14. Alan Maahs operated the crane from the cab, and the plaintiff and John Wright rode to the ceiling on the forks.

15. While they were at the top of the mast, Mr. Maahs was summoned to the ground floor to answer a telephone call.

16. The cab and the forks were lowered to the floor with fork blades being brought to a halt three to four feet above the floor.

17. Mr. Maahs left the cab to answer the telephone and the plaintiff and John J. Wright remained standing on the fork blades awaiting the return of Mr. Maahs.

18. When Mr. Maahs left the cab to answer the phone, he left the hoist control in the neutral position.

19. Suddenly, and without warning, the fork control was activated, and the hoist and fork blades began moving upward from the floor towards the ceiling.

20. While standing on the fork blades, plaintiff was propelled through the window opening of the cab by the upward movement of the blades. The fork blades continued their upward movement, and consequently, the upper part of the plaintiff's body was trapped in the cab, with the fork blades pushing the lower part of his body upward. Whereupon, plaintiff was caught between the cab and the moving fork blades.

21. Between the date of installation of the aforesaid crane by defendant and December 22, 1969, the date of the accident, no substantial alterations, modifications or changes were made to, in, or upon the said crane, and on the later date, the crane was in substantially the same condition as when it was originally installed at the Edgcomb plant by defendant.

22. The window opening in question was not equipped with screens at the time of installation of the crane. However, even if the window had been equipped with partial screens, as indicated by the defendant's construction drawings, they would not have precluded the happening of this accident.

23. The handcontrol, which controls the hoist, does not have a spring to return it to the off position when it is released.

24. The control lever for the hoist mechanism was not equipped with positive detents sufficient to prevent the control from accidentally slipping into gear by means of vibration or jolts exterior to the control.

25. The detents on this handcontrol are not continuous, in that the control may easily be set between two positions without being in either, thus the hoist can be turned off without the control lever being set at the off position, thus enabling a slight jar to cause the control to move into the on position.

26. The crane in question was not equipped with a "dead-man" switch, or other fail-safe device, which could easily and with minimal expense have been affixed to the machine.

27. Such a "dead-man" switch would insure that the hoist would not operate without an operator being present in the cab, and would have prevented the occurrence of the accident in this suit.

28. The on—off button, located on the control panel of the cab was not a fail-safe device, inasmuch as it required a conscious, positive act on the part of the crane operator to effectuate such control.

29. Defendant, at all times herein relevant, including prior to December 22, 1969, knew or ought to have known that employees of its customers regularly rode the fork blades to the top of the crane for the purposes of performing maintenance and repair thereon.

30. The accident involved herein could not have occurred if the crane in question had been equipped with a fail-safe device as previously described, or screening sufficient to fully cover the opening.

31. At the time of manufacture of the crane in question, the provision of one or more of these safety devices would have been in accord with generally accepted engineering practice in the design of all types of industrial machinery, involving a risk of injury to persons in contact with the same, including cranes such as the one concerned herein.

32. At the time of the design and manufacture of the cranes involved herein and at all times subsequent thereto, defendant was aware of the existence and availability of such safety devices.

33. Failure of the defendant to supply either a dead-man's switch or adequate screening on a crane with the type of controls which were supplied, rendered the said crane defective and unreasonably dangerous to its users, under ordinary conditions.

34. Following the accident described herein, other workers at the Edgcomb plant ordered the main power to the crane shutoff and extricated plaintiff from the cab.

35. Plaintiff was placed on the floor at which time it was noticed that his face was purple, that he was bleeding from the mouth and that he had stopped breathing.

36. Mr. Maahs administered mouth to mouth resuscitation to revive plaintiff.

37. Plaintiff stopped breathing on several occasions and was resuscitated in the same manner until an ambulance arrived and took plaintiff to Nazareth Hospital.

38. As a result of the foregoing incident, plaintiff was literally hung by the action of the crane. When admitted to the hospital, plaintiff suffered cardiac arrest and was resuscitated again. A tracheostomy was performed at the hospital to facilitate breathing. Plaintiff also sustained contusions of the larynx, severe avulsion of both brachial plexuses, fracture of the mandible, initial paralysis of both deltoids and both biceps, and a loss of movement in the left leg suggestive of spinal cord injury.

39. The tracheostomy tube remained in plaintiff's throat for approximately two and one-half weeks following his admission to the hospital.

40. Upon admission to the hospital, a catheter tube was inserted to relieve plaintiff's bladder.

41. Plaintiff remained in the intensive care unit of Nazareth Hospital for a period of two and one-half weeks until January 11, 1970.

42. On January 11, 1970, plaintiff was discharged from Nazareth Hospital

to the care of Paul M. Lin, M.D., a neurosurgeon, under whose care plaintiff remained until January 13, 1971.

43. Upon plaintiff's discharge from the hospital, a final diagnosis was made of cerebral concussion, asphyxia or strangulation, contusions of the neck and larynx, severe avulsion of both brachial plexuses, and compound fracture of the mandible.

44. Following his discharge from the hospital, plaintiff embarked upon an intensive program of physiotherapy, under the supervision of Domenic G. E. Cardelli, P.T., of the Physical Therapy Department of Nazareth Hospital.

45. Plaintiff attended physical therapy sessions three times per week for nine months.

46. For a period of approximately one year following the accident, plaintiff was unable to resume normal sexual relations with his wife.

47. While plaintiff has recovered from most of the above injuries, he continues to suffer a lack of strength in both arms, weakness in his left leg, which restricts his leisure activities, and persistent and continuous pain in the neck at the situs of the tracheostomy incision.

48. With regards to his arms, plaintiff has recovered 90% of full motion, but has sustained a permanent loss of 10% of the motion in those limbs.

49. Plaintiff has sustained a permanent diminution of manual dexterity, restricting his activities where a high degree of manual dexterity is required.

50. As a result of the foregoing injuries, plaintiff has sustained a loss of earnings in the amount of $1,864.00.

51. As a result of the foregoing injuries, plaintiff has incurred hospitalization and medical expenses in the amount of $2,752.95.

52. As a result of the foregoing injuries, plaintiff has suffered damages for the impairment of his future earning capacity and for the mental pain and suffering in the amount of $30,000.00.

## DISCUSSION

Plaintiff's main theory of liability is of absolute liability under § 402A of the Restatement of Torts 2d which provides:

1. One who sells any product in a defective condition unreasonably dangerous to the user . . . is subject to liability for physical harm thereby caused to the ultimate user . . . if (a) the seller is engaged in the business of selling such a product and (b) it is expected to and does reach the user without substantial change in a condition in which it is sold.

This provision of the Restatement has been adopted by Pennsylvania. Webb v. Zern, 422 Pa. 424, 220 A.2d 853 (1966).

Since it is admitted that defendant is a seller of the equipment involved, it is necessary to inquire only whether the evidence establishes:

1. That the product was in a defective condition, unreasonably dangerous to the user; and

2. That the product was expected to and did reach the user without substantial change in the condition in which it was sold.

Plaintiff's main contentions with respect to the dangerous condition are that it lacked adequate safety devices to prevent an accident such as occurred in this case. It is clear that under § 402A, lack of a proper safety device can constitute a defective design for which there may be recovery. Dorsey v. Yoder Co., 331 F.Supp. 753 (E.D.Pa. 1971); See also Bartkewich v. Billinger, 432 Pa. 351, 247 A.2d 603 (1968). The focal issue in these cases is whether the absence of the safety device created an unreasonable danger to the operator. Dorsey, supra.

In the case at bar, we have found that the failure to supply either a "dead-man's" switch or adequate screening on a crane with the type of controls which were supplied, rendered the crane defective, and unreasonably dangerous to the user.

Defendant contends that if there was any dangerous condition on the crane hoist in the case at bar, that such condition was obvious to the plaintiff and that by "riding the forks" plaintiff assumed the risk of any injury he sustained. Whether or not the danger was obvious is a factor to be considered in deciding whether or not the alleged defective design created an unreasonable danger to the plaintiff. In the case at bar, the danger of being propelled into the window of the cab and then caught between the forks and the cab by a sudden unexpected movement of the forks would not have been obvious to the plaintiff. However, even if the danger was obvious to the plaintiff, this would not, *ipso facto*, preclude recovery. Dorsey, supra. Obviousness is but one factor to be considered in determining whether or not the defect created an unreasonable danger. We hold that it did. Accordingly, defendant's contention must be rejected.

Defendant's contention that plaintiff assumed the risk of any injury he sustained is without merit. Section 496(d) of the Restatement of Torts 2d states: "Except where he expressly so agrees, a plaintiff does not assume the risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character." There was no evidence in the case at bar that plaintiff chose to risk the danger which resulted in his injuries. In order to charge the plaintiff with assuming the risk, he must have had the opportunity for a conscious appreciation of the danger and a willingness to risk it. Assumption of risk is not the same as contributory negligence. Elder v. Crawley Book Machinery Co., 3 Cir., 441 F.2d 771. Accordingly, we make the following conclusions of law.

## CONCLUSIONS OF LAW

1. This court properly has jurisdiction over the parties and the subject matter of the within action.

2. Defendant's design, manufacture and sale of the defective crane hoist, unreasonably dangerous to the user, renders it liable to the plaintiff under § 402A of the Restatement of Torts 2d, as adopted by Pennsylvania, for the injuries plaintiff sustained.

3. Plaintiff had not assumed the risk of the injuries he sustained.

4. As a result of such liability, plaintiff is entitled to a judgment against the defendant in the amount of $34,616.95.